**BRESWICK & CO., Randolph Phillips and Myron Neisloss, as common stockholders of Alleghany Corporation, individually and on behalf of all other common stockholders of Alleghany Corporation similarly situated, Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Alleghany Corporation, et al., Defendants.**

United States District Court
S. D. New York.

Sept. 27, 1957.

**228**

Rosston, Hort & Brussel, New York City (George Brussel, Jr., New York City, and Eugene G. King, New York City, of counsel), for Breswick & Co. and Myron Neisloss.

Randolph Phillips, pro se.

Robert W. Ginnane, Gen. Counsel, Washington, D. C. (B. Franklin Taylor, Jr., Asst. Gen. Counsel, Washington, D. C., on the brief), for Interstate Commerce Commission.

Simpson, Thacher & Bartlett, White & Case, New York City, Wheeler & Wheeler, Washington, D. C. (Whitney North Seymour and David Hartfield, Jr., New York City, Edward K. Wheeler, Washington, D. C., David W. Wallace, New York City, of counsel), for Alleghany Corp.

Proskauer, Rose, Goetz & Mendelsohn, New York City (Harold H. Levin, New York City, Marvin E. Frankel, Washington, D. C., and Allen L. Feinstein, New York City, of counsel), for defendants Joseph S. Gruss et al.

Edward M. Garlock, New York City, for defendants Baker, Weeks & Co., Oscar Gruss & Son, Irving Neuman as Trustee under a Deed of Trust dated November 6, 1943, and Edward Gornish.

Samuel A. Mehlman, New York City, pro se.

Alexander Kahan, New York City, and Arthur W. Lichtenstein, New York City (Alexander Kahan, New York City, of counsel), for Adelaide Neuwirth and common stockholders of Alleghany Corp., representatively.

Before CLARK, Circuit Judge, and DIMOCK and WALSH, District Judges.

WALSH, District Judge.

Plaintiffs, common stockholders of Alleghany Corporation, by this action seek review of an order of the Interstate Commerce Commission authorizing Alleghany to issue certain stock.[1] We had

I. Briefly the history of this proceeding is as follows:

March 2, 1955—Division 4 of I.C.C. ordered that Alleghany be considered as a carrier subject to its regulation. 290 I.C.C. 725.

April 6, 1955—Plaintiffs, in a related action, Breswick & Co. v. Briggs, sought injunction of present stock issue. The application was denied to permit I.C.C. to

give prior consideration to plaintiffs' claim. D.C., 130 F.Supp. 953.

May 24, 1955—Full Commission affirmed Division 4's holding as to status. 295 I.C.C. 11.

May 26, 1955—Division 4 approved present stock issue.

June 6, 1955—Present action commenced by plaintiffs. No application was

previously held that the Commission lacked jurisdiction to promulgate the order and that the issue was subject to the Investment Company Act, 15 U.S. C.A. § 80a–1 et seq. The Supreme Court reversed this holding and held that the issue was subject to the Interstate Commerce Act. It remanded the case to us for consideration of plaintiffs' claim that the issue violated that Act.[2]

The stock in controversy consisted of 1,367,440 shares of 6% preferred stock having a par value of $10 to be offered ten for one in exchange for the pre-existing 5½% preferred, having a par value of $100. It was to be convertible at the option of the holder into common stock, according to a formula which resulted in an actual conversion ratio of 4.7 shares of common for each share of new preferred, upon payment to the corporation of $3.75 per common share. The issue of the common stock necessary for conversion was also authorized.

Plaintiffs contend that the Commission's findings as to the fairness of the issue are inadequate and are in conflict with undisputed facts. They claim in substance that the worth of the old preferred was overestimated by giving it a value of $100 par value, plus $5 redemption premium, plus $132 accumulated dividends; that it was improper to include the redemption premium and to assume that the dividends would be readily payable in cash. They suggest that the market value, which never previously exceeded 170, was more realistic and should have been used. They also claim that the value of the new preferred was underestimated; that in particular the value of the fifteen year non-call period allowed for conversion was overlooked entirely, although it became markedly apparent when, after the plan of exchange was announced, the market price of the preferred exceeded the $237 value assumed for purposes of the exchange, by almost fifty percent. In other words, whereas the old preferred had never sold above $170 prior to the announcement of the plan, its equivalent

made for temporary injunction pending final disposition by I.C.C.

June 22, 1955—Full Commission denied reconsideration of order authorizing stock issue. Notwithstanding plaintiffs' application for a stay the order was made effective immediately.

June 23, 1955—This order was made public but notice thereof was not given plaintiffs. Alleghany immediately commenced issuance of the stock pursuant to the authorization of the Commission.

June 23, 1955—Plaintiffs, having learned of the Commission order after two-thirds of the stock had been issued, obtained a restraining order staying transactions with respect to the stock pending disposition of this proceeding.

July 21, 1955—A preliminary injunction was granted by this Court (Hincks, C. J., dissenting). D.C., 134 F.Supp. 132.

August 3, 1955—The preliminary injunction was stayed by Mr. Justice Harlan as to that part of the stock issued before this Court's restraining order was granted. 75 S.Ct. 912.

November 18, 1955—Enforcement of the I.C.C. order and issuance of the stock was permanently enjoined, it being held that the Commission was without jurisdiction over Alleghany. D.C., 138 F. Supp. 123. Frank, C. J., had replaced

Judge Hincks as a member of this Court. This Court stayed the injunction pending appeal. The preliminary injunction, as modified by Mr. Justice Harlan, was continued.

April 22, 1957—Supreme Court reversed our holding but declined to vacate the preliminary injunction, remanding the case for consideration of claims not previously considered as to the failure of the Commission's order to comply with the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq. Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726.

June 14, 1957—An application to this Court to vacate the preliminary injunction was denied. Chief Judge Clark had replaced the late Judge Frank as a member of this Court.

2. The scope of the remand was stated as follows, 353 U.S. at page 175, 77 S.Ct. at page 777:

"For all these reasons, the judgment of the District Court must be reversed and the case remanded for consideration by the District Court of appellees' claim, not previously discussed, that the preferred stock issue as approved by the Commission was in violation of the Interstate Commerce Act. * * *"

in the new preferred traded upon a "when issued" basis rose to 352½ prior to the suspension of trading. They claim that the excess of 352½ over 170 represents a "premium" to the preferred stockholders, an excessive benefit at the expense of the corporation and thus the common stockholders.

In answer it is contended that the offer of the exchange was the only feasible way in which to get rid of the burden of accumulated dividends without requiring a large outlay of cash; that the benefits to be given the new preferred in order to make the exchange attractive was primarily a matter of business judgment; that the market action of the preferred does not indicate that an excessive premium was given it at the expense of the common because a substantial part of the increase paralleled an increase in the common into which the new preferred was convertible.

■ As to these contentions of the plaintiffs, we believe that the facts disclosed to the Commission and available as matters of public knowledge were enough to put an expert body on notice of all the alleged undesirable qualities of the issue; that the questions so raised were within the range of expert judgment reserved to the Commission; that its findings thereon satisfy the statute; and that we may not substitute our views for those it expressed.

■ Plaintiffs also protest that the Commission conditioned its approval upon the change in plan never ratified by the stockholders. The proposed plan had provided that the conversion ratio should be fixed as of the fifth market day following Commission approval. The Commission conditioned its approval upon modification of the exchange offer so that the conversion ratio would be fixed as of the last market day preceding its order. The Commission has power to grant the application "upon such terms and conditions as the commission may deem necessary or appropriate in the premises". 41 Stat. 495, 49 U.S. C.A. § 20a(3). The question whether the exchange would involve a violation of some contractual arrangement with the stockholders is not before us. This contention does not affect the validity of the Commission's order.

■ As to matters of procedure, plaintiffs complain that they were entitled to an evidentiary hearing before the Commission and that they were deprived of that right. This point was raised before the Supreme Court and, if not decided adversely to them, we understand the Supreme Court's statement that the point is governed by section 20a(6) of the Interstate Commerce Act, 41 Stat. 495, 49 U.S.C.A. § 20a(6), to restrict our consideration to the effect of that section. Under that section the Commission has almost free discretion as to how it may best proceed with its investigation. It was not required as a matter of law to hold evidentiary hearings to enable plaintiffs to amplify by cross-examination of corporate officers points already ascertainable from facts before it. Plaintiffs urge the admitted complexity of the plan and the heavy investment in preferred stock by the dominant officer of Alleghany just before announcement of the plan. They also show that by refusing to thus open its investigation the Commission apparently missed evidence subsequently supplied to the Securities and Exchange Commission, such as a memorandum from Alleghany's files discussing the value of the non-call period, the minutes of the board meeting which are said to show that this feature was not in the plan when originally approved, and an analysis of the market action of earlier conversion warrants which might have foretold the market action of the preferred after the present plan closed. Loss of this type of evidence is, however, a known risk which an agency takes when it declines to open its investigation to controversy. The Commission is given that power by statute.

There nevertheless does remain a major problem—the need for validation of Alleghany's acquisition of the Central

system as a prerequisite to the Commission's grant of the relief requested. We do not raise again the question of jurisdiction;[3] but we now raise the question of findings necessary as a preliminary to relief on the merits, action necessary if the order of the Commission is to conform with the Interstate Commerce Act.

The facts now established are that Alleghany has control of the New York Central and that the Central is itself a carrier with control of a large number of other carriers. The Commission was never asked to approve Alleghany's acquisition of control over this group of carriers and has carefully refrained from so doing.[4]

This problem presents two separate questions: (1) does the acquisition of an already integrated system of separately existing carriers require Commission approval under subdivision 2 of section 5; and (2) if it does, may the Commission proceed to regulatory determinations, deferring meanwhile the question of whether it will authorize the continuation of this control, upon which its jurisdiction over Alleghany depends. The second question becomes more pointed where, as here, the assumption of regulatory responsibility by the Commission shields the person guilty of the unapproved acquisition from regulation by another agency.

With respect to the first question, until this case arose, it had been the consistent view of the Commission that its approval of such an acquisition of control and its finding of consistency with the public interest was required. Arkansas & L. M. Ry. Co.—Control, 282 I.C.C. 254; Weinstein—Control—Capital Transit Co. and Montgomery, 56 M.C.C. 127; Seaboard Air Lines Ry. Co.—Receivership, 261 I.C.C. 689. This view was well expressed by Division 4 in its opinion with respect to Alleghany's application for authority to merge one of the Central's subsidiaries, the Louisville & Jeffersonville Bridge and Railroad Company, 290 I.C.C. 725, 733-4.[5] The full Commission departed from this position and held to the contrary. 295 I.C.C. 11.[6] We re-

---

3. The Supreme Court held that jurisdiction could be based upon unapproved acquisition of control as well as approved. 353 U.S. at pages 161–162, 77 S.Ct. at page 769. It said:

    "The District Court held that whatever control Alleghany had over Central did not fit within the statutory requirement of 'a person which is not a carrier and which has control of one or more carriers' because the Commission had not given the approval necessary for acquisition of control of Central and its subsidiaries, 'two or more carriers.'

    "The Commission and Alleghany contend that Commission approval of the acquisition of a single, integrated system is not necessary. We need not decide this question, however, and intimate no opinion on it, for even if such approval is necessary, the statutory requirement of 'a person which is not a carrier and which has control of one or more carriers' refers to 'control' and not to 'approved control.' There seems to be no reason to read in the word 'approved.' Such a holding would mean that the failure of a company engaging in a transaction requiring Commission approval to apply for that approval would deprive the Commission of jurisdiction. Remedies against a violator are provided by § 5(7), (8), and (9) of the Act. To punish a violator by depriving the Commission of jurisdiction over it would be indeed quixotic. As the Commission points out, the problem would appear clearer were Alleghany contesting, rather than acquiescing in, its jurisdiction."

4. Inasmuch as the full Commission believed its approval unnecessary this was a matter considered only by Division 4. See Louisville & J. B. & R. Co., Merger, 290 I.C.C. 725, 733, 741, 746. These findings are also printed in the Record on Appeal to the Supreme Court, Alleghany Corp. v. Breswick & Co. See pp. 425, 435, 441–442. The finding of consistency with the public interest, insofar as it related to control was restricted to the properties and franchises of the Louisville & Jeffersonville Bridge and Railroad Company, 290 I.C.C. 725, 747; Record, op. cit. p. 443.

5. Record, op. cit., pp. 425–427.

6. Its opinion has not yet been bound. It may be found in the Record on Appeal to the Supreme Court, Record, op. cit., pp. 506–515. The brief discussion of the subject occurs at p. 512.

versed the Commission holding [7] and we in turn were reversed upon other grounds. The Supreme Court left the question open.[8]

■■ Without going into the question of whether our previous determination in this regard remains the law of the case we express afresh our conclusion that such approval is required. The statute unequivocally requires Commission approval for the acquisition of two or more carriers by any person. It reads:

"It shall be lawful, with the approval and authorization of the Commission * * * for a person which is not a carrier to acquire control of two or more carriers * * *". § 5(2)(a).

Its language does not suggest any exceptions and certainly none on the basis of common control by someone else having been previously authorized. It seems to us that as long as the carriers remain unmerged and unconsolidated, the Commission has full power and the duty to decide whether control of them all or any of them by the proposed new person is in the public interest. This was the

unchallenged prior consistent administrative interpretation by the Commission.[9] The full reasons for our holding were expressed in our earlier opinion at 134 F.Supp. 132, 142, and in Appendix II to our per curiam opinion at 138 F.Supp. 123, 137. We reaffirm them. We believe our view is strengthened by the emphasis in the Supreme Court's opinion upon the importance of keeping sight of the individual entities within the system. 353 U.S. at page 170, 77 S.Ct. at page 774.[10]

If our conclusion in this regard is to stand, subdivision 4 of section 5 provides in emphatic terms that Alleghany's unauthorized seizure of control of the Central and its subsidiaries was unlawful and that its continued control of these carriers is unlawful as well.

Subdivision 7 of that section mandates action by the Commission to compel correction of violations of this particular subdivision, once the facts are known. It provides:

"The Commission is hereby authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to in-

7. D.C., 134 F.Supp. 132, 143–144; D.C., 138 F.Supp. 123, 137–138.

8. Alleghany Corp. v. Breswick & Co., 353 U.S. at page 161, 77 S.Ct. at page 765.

9. In Louisville & J. B. & R. Co.—Merger, 290 I.C.C. 725, 733, Division 4 said:
"The Central system includes many individual carriers which are controlled by Central through stock ownership or otherwise. We long have recognized under section 5, that railroad systems are comprised of 2 or more carriers, and that control of a single system may not lawfully be effectuated without our approval and authorization. [Citing Seaboard Air Line Ry. Co.—Receivership, 261 I.C.C. 689, 717. New York S. & W. R. Co.— Reorganization, 282 I.C.C. 801 (not printed in full). Arkansas & L. M. Ry. Co.—Control, 282 I.C.C. 254, 260. Weinstein—Control—Capital Transit Co. and Montgomery, 56 M.C.C. 127, 131. Stoughton—Control—Delaware Coach Co., 57 M.C.C. 456. Kittrell—Control— Dixie Motor Coach Corp, 37 M.C.C. 91.] That principle is considered basic, almost as a definition. So much so, that the

question of acquisition of a carrier system has never been contested before the Commission, and as far as we know, there have been no court decisions touching on that issue. Nevertheless, because of the stress which Alleghany places on this point, some discussion thereof is necessary."

10. In earlier stages of the litigation defendants have expressed fear that injecting the Commission into proxy contests would unduly interfere with stockholder suffrage. As we pointed out in an earlier opinion, 134 F.Supp. 132, 144, although this concern might have relevance where control was acquired other than by the acquisition of a controlling block of corporate stock by a single person, or a small concerted group of persons, there were no findings that such was the case here. On the contrary, a significant part of the Commission's regulation of Alleghany has concerned the acquisition of such a block of Central's stock and coordinated activities of Alleghany's officers as individual stockholders of Central. See Chesapeake & O. Ry. Co.— Purchase, 271 I.C.C. 513 (1948).

vestigate and determine whether any person is violating the provisions of paragraph (4). *If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation.* The provisions of this paragraph shall be in addition to, and not in substitution for, any other enforcement provisions contained in this chapter; and with respect to any violation of paragraphs (2) to (12), inclusive, of this section, any penalty provision applying to such a violation by a common carrier subject to this chapter shall apply to such a violation by any other person." (Emphasis added.)

Ordinarily, if the facts were less conclusive, the Commission would commence its own investigation which would proceed concurrently with the investigation concerning Alleghany's application. Here, however, there is no question of further investigation; the facts are undisputed; the Commission's findings are complete.[11] This point was inescapable

because the Commission's power to pass upon the issuance of stock by Alleghany, which it exercised, depended upon the fact that Alleghany controlled the New York Central system. The question is simply one of law. The Commission, after reversing Division 4, proceeded to the merits of Alleghany's various applications, on the assumption that Alleghany's control of the carriers in question was lawful. This view was erroneous.

■ Under these circumstances, should authorization of the issue of stock be permitted to stand? We do not see how the adequacy of the security of the new preferred could be calculated until this question is resolved or at least considered. Alleghany's investment in the Central system, as last shown in the record, was $14.7 million, over ¼ of its total portfolio.[12] As long as Alleghany's control of Central is unapproved, it is subject to injunction, divestiture and other sanctions.[13] The effect of this cloud upon the value of the stock is a matter for expert consideration rather than our speculation. In the absence of compelling reasons to the contrary, as to which no findings were made,[14] author-

---

11. The findings are to be found in Louisville & J. B. & R. Co.—Merger, supra, 290 I.C.C. 725, at pp. 733, 741, Record, op. cit., pp. 425, 435. (Division 4) and 295 I.C.C. 11, Record, op. cit., pp. 511–512, 513 (full Commission).

12. The schedule of Alleghany's investments as of December 31, 1954 was as follows (Record, op. cit., p. 166):

| | Cost | Indicated Market Quotations |
|---|---|---|
| New York Central Securities | $ 6,918,118 | $ 9,607,800 |
| Alleghany share of joint ventures in Central investments (See Note (3) Record p. 169) | 7,500,000 | 10,050,000 |
| | $14,418,118 | $19,657,800 |
| Total investments | $33,342,393 | $67,944,633 |

13. As to carriers, the usefulness of these assets may also be subjected to other restrictions. See Bonds of St. Louis-S. F. Ry. Co., 150 I.C.C. 139 (1928), in which an unapproved acquisition by a carrier was held to be not capitalizable. The extent to which analogous restrictions might apply to the financing of a person not a carrier is a matter for consideration by the Commission.

14. The only findings of possible significance in this regard are that the plan was a further step in a program initiated eight years earlier, in September, 1946; that it will eliminate dividend arrearages and give the preferred stockholders an opportunity to participate in the "progress of the applicant". Record, op. cit., pp. 528–530. Contrast the findings by Division 4 as to why Alleghany should

ization of continued control should logically be determined before the stockholders act upon the proffered exchange and before the stock becomes available for sale to the public, not afterwards. To say the least, it would be arbitrary to authorize the issue without even considering the effect of divestiture upon the value of this important asset as long as that action remains a possibility. Reconsideration by the Commission for that purpose is therefore necessary. The Commissioner's duty under section 20a is for the protection of investors as well as persons dependent upon transportation.[15]

be required to report as a carrier notwithstanding the illegality of the manner by which it obtained its status. Louisville & J. B. & R. Co.—Merger, supra, 290 I.C.C. 725, at p. 741.

15. While the dominant purpose of § 20a was to ensure sound railroad financing in the interest of the proper development of our transportation system, an important related aim was "to protect the investing public against the dissipation of railroad resources through faulty or dishonest financing". Sharfman, The Interstate Commerce Commission, Vol. I, pp. 189, 190.

Throughout the history of this legislation, there was universal recognition of the interrelation of sound railroad financing and the protection of investors, the latter being essential to maintaining confidence in railroad investment. 58 Cong. Rec. 9160, 9163 (66th Cong., 1st Sess.); Sharfman, The Interstate Commerce Commission, pp. 190–191 (1931).

" * * * If the people who have money will not invest it in the transportation enterprise, private ownership and operation under public control must necessarily fail. It is apparent, therefore, that any legislation which may be proposed upon the hypothesis of private ownership and operation must tender to the future investor reasonable security for the investment he is asked to make and reasonable assurance of such yearly return upon his money as will induce him to enter the field." Senate Report No. 304, 66th Cong., 1st Sess. (1919).

See also testimony of Commissioner Clark, Hearings before the Senate Committee on Interstate Commerce on Extension of Tenure of Government Control of Railroads, Vol. I, p. 343 (1919); The New England Investigation, 27 I.C.C. 560, 616 (1913); Matter of Consolidations & Combinations of Carriers, 12 I.C.C. 277, 306 (1907); see also 21st Annual Report of Interstate Commerce Commission, p. 24 (1907).

In 1913 and 1916, the House of Representatives passed legislation which substantially incorporated the provisions of the present § 20a. The House Reports on these bills indicate recognition of the fact that one of the aims of the statute was to protect investors from the abuses of speculative financing. H.R.Report No. 681, pp. 3, 4 (63rd Cong., 2d Sess., 1914); H.R.Report No. 349, pp. 8, 9 (64th Cong., 1st Sess., 1916). This was made explicit by a question addressed to Mr. Rayburn, a member of the House Committee on Interstate and Foreign Commerce, during debate on the 1913 bill:

"Mr. McKenzie: Is it not one of the main purposes of this bill to give stability and value to railroad stocks and bonds for the protection of the men and women who invest their money in these stocks and bonds in good faith, so that the rate to be charged by the railroads is not the only material fact in the bill?

"Mr. Rayburn: It [the rate charged] is not; but the gentleman's question answers itself and answers it much better than I can, and I thank him for it." 51 Cong., Rec. 9687 (63rd Cong., 2d Sess., 1914).

By exempting carrier securities from any state or Securities and Exchange Commission regulation, Congress has given further evidence that it looks to the I.C.C. to protect the welfare of investors in considering stock issues under § 20a. It is impossible to believe that Congress could have intended investors in carrier securities to be left without any of the protections afforded other investors. When Congress exempted corporations like Alleghany from compliance with the provisions of the Investment Company Act, it manifested no intent to deprive stockholders in such companies of the safeguards provided for other investment companies, but merely an intent to avoid dual regulation.

In this regard we modify the view we expressed in our earlier opinion, 134 F. Supp. 132, 140, footnote 9, in which we said:

"The I.C.C. control with respect to the issuance of securities is merely to protect against over-issue, not to hold the balance between management and investor."

This was an overstatement; its emphasis upon the Commission's primary responsibility neglected the secondary duty to protect public investors.

Neither do we see how an order for the private benefit of Alleghany may be said to be in compliance with the Act when Alleghany's status under the Act and sole basis for claiming to be entitled to this relief, or any relief under the Act, is that of a wrongdoer in unlawful control of a group of carriers. Here there is no finding of public advantage to be gained from granting Alleghany's application. Unlike the status order which made available to the Commission information for the protection of the public or even the merger of the Bridge Company which was expected to produce operating economies of ultimate value to the public, the present order is unaccompanied by any finding of fact which would suggest a rational basis for action in advance of an investigation into the legality of Alleghany's acquisition of control. Here an investment company has been barred from issuing the stock in question by the Securities and Exchange Commission. In violation of the Interstate Commerce Act it has obtained control of a group of carriers. Solely upon the basis of this violation it now claims the advantage of less rigidly restricted financing which the Investment Company Act intended only for a person who had previously satisfied the Interstate Commerce Commission that his

control of a carrier would be consistent with the public interest. The Interstate Commerce Act was never intended as a source of relief for a person in illegal control of a carrier. Such a person might be subject to all the burdens and duties imposed by the Act upon a person in legal control, but relief or benefit for such a person may not be rationally authorized under the Act, except upon finding that the public interest required such authorization notwithstanding that person's violation of the Act. In the absence of any finding that immediate action is needed in the public interest, as distinguished from the private interest of Alleghany, the stock authorization should await an appropriate application for approval of its control.

Further, reconsideration by the Commission is required because, once the error of law is recognized, the Commission's action would be in arbitrary conflict with its own settled policy, to compel prompt application for approval of acquisition of control where required under the statute, a conflict with which the Commission was not faced so long as it believed approval of acquisition of an integrated system unnecessary. It has consistently denied relief sought by those in illegal control[16] and usually compelled

---

16. It is the practice of the Commission when an application discloses an underlying violation of section 5 to commence its own investigation into the violation which is conducted concurrently with the investigation of the application. In the absence of exceptional circumstances the application will be denied and divestiture ordered. Cases in which applications for merger were denied because of prior unauthorized control are: Gisinger—Investigation of Control, 60 M.C.C. 321, 327 (1954); Transcontinental Bus System, Inc.—Investigation of Control (Arkansas Motor Coaches), 57 M.C.C. 323 (1951); Pacific Greyhound Lines—Control and Merger, 56 M.C.C. 415, 434–440 (1950); Hodge—Control, 40 M.C.C. 499 (1946). In Gisinger—Investigation of Control, supra, 60 M.C.C. 321, 327, 329 (1954), it was said:

"The application in this proceeding is in effect a request for validation of the existing unlawful control. The merger of the properties is merely a second step to change the form of the control already unlawfully in effect. The act contemplates that consideration be given to 'proposed' transactions under section 5. Although it has been stated that such violations of section 5 are not an absolute bar to approval, each case must be considered on its merits * * *". (327)

"* * * In effect, applicants would have us ignore the unlawful control which has now continued for some years, and authorize the merger on the basis of the evidence presented, which is largely based on the unlawful control and the operations thereunder and directed primarily to the merger. The real issue is whether the common control of these carriers should be sanctioned under the circumstances presented. In our opinion, this record shows such a flagrant disregard for the law that divestiture should be ordered". (329).

divestiture[17] except where it has found continuation of the control clearly in the public interest and, in most cases, that the failure to request approval was in good faith due to an oversight.[18] Reopening of the Commission proceeding is necessary so that the Commission may give consideration to such findings here.

Finally, for even more fundamental reasons this order must be set aside. Although the Supreme Court has eliminated all doubt as to the Commission's jurisdiction—its power to decide the question here presented—it has not excused it from the need for making this decision, and making it in a logical sequence with respect to other regulatory decisions. The sequence of Commission determinations may not be in arbitrary and capricious disorder; it must have a rational basis just as each order must in itself have such a basis. The approval of acquisition and continued control is an obvious first question in any application by Alleghany because unless the Commission intends to approve this control, it would be regulating a company which should be properly under the control of another agency; it would be granting a wrongdoer sanctuary from the Investment Company Act; and it would be authorizing and ordering acts in aid of a known violation of the Interstate Commerce Act. The ultimate crucial result of such temporizing would be that by granting seemingly innocuous piecemeal applications, it would unobtrusively foreclose itself from any realistic determination of

Cases in which the Commission has refused to approve purchases of stock for this reason are: Kolowich—Control, 58 M.C.C. 599, 609 (1952) ; Welch—Control, 56 M.C.C. 505 (1950) ; Mooney—Control, 56 M.C.C. 771 (1950) ; Pacific Greyhound Lines—Control and Merger, supra, 56 M.C.C. 415, 434 (1950) ; Casser—Investigation of Control, 57 M.C.C. 53, 67 (1950) and 55 M.C.C. 696 (1949) ; Hodge—Control, supra, 40 M.C.C. 499 (1946) ; Manlowa—Control, 45 M.C.C. 125 (1946). Cases denying applications to transfer operating rights for this reason are: Interstate Motor Freight System—Purchase, 65 M.C.C. 37, 53 (1955) ; Myrick—Purchase, 57 M.C.C. 1 (1950); Jones—Purchase, 57 M.C.C. 105 (1950) ; Texas, New Mexico & Oklahoma Coaches, Inc.—Purchase, 55 M.C.C. 269 (1948) ; Congdon—Purchase, 50 M.C.C. 781 (1948) ; McRae—Purchase, 45 M.C.C. 636 (1947) ; Mitchell—Purchase, 40 M.C.C. 283 (1945) ; Tornetta—Purchase, 40 M.C.C. 339, 343 (1945).

Similarly, it has refused to approve an issue of securities for the purpose of financing an unapproved acquisition. Bonds of Chesapeake & O. Ry. Co., 150 I.C.C. 257, 259–60 (1929).

17. Denial of applications is usually accompanied by compelled divestiture, although sometimes left to be accomplished voluntarily or by subsequent proceeding. Divestiture was ordered in Gisinger—Investigation of Control; Transcontinental Bus System, Inc.—Investigation of Control; Pacific Greyhound Lines—Control and Merger; Myrick—Purchase; Kolowich—Control; Mooney—Control; Casser—Investigation of Control; McRae—Purchase; Manlowa—Control; op. cit.

18. In Casser—Control—Bingler Vacation Tours, Inc., 57 M.C.C. 53, 67, the Commission said:

"* * * and we have given our approval to concluded transactions under that section [§ 5] only in comparatively rare instances where the parties had acted *in entire good faith, appropriate applications were filed promptly upon apprisal of the unlawfulness,* and the transaction clearly was consistent with the public interest".

The fact that the applicant was in good faith unaware of the illegality, is a significant consideration. Coast Line Truck Service, Inc.—Control and Merger, 58 M.C.C. 115, 131 (1951) ; Consolidated Truck Lines—Control and Merger, 57 M.C.C. 277, 281 (1951) ; Sims—Purchase, 40 M.C.C. 228, 230 (1945). In some cases applications have also been granted because there is a strong public interest in continuance of service which might be disrupted if divestiture were ordered; in other words, the violation is tolerated in the interest of the public, not out of consideration for the violator. Baggett—Control, 65 M.C.C. 522, 525 (1955) ; Potomac Coach Lines, Inc.—Purchase, 57 M.C.C. 199, 207 (1950) ; Capitani—Control, 57 M.C.C. 413, 420 (1951) ; Bowman—Control, 55 M.C.C. 802 (1949); Commercial Petroleum and Transport—Control, 58 M.C.C. 439, 459 (1952) ; Lee—Control, 50 M.C.C. 163, 168 (1947). Cf. Cochrane—Purchase, 40 M.C.C. 233, 237 (dissenting opinion) (1945).

the fundamental question, because after the passage of time the disruption of the carriers in the system and of the public service, caused by divestiture, would be so great that it would necessarily be discarded as a practical alternative.[19]

We have been confronted with the claim that our view is inevitably inconsistent with that of the Supreme Court because otherwise it would not have left undecided the question of whether Commission approval was required with respect to a system of carriers already under common control. We see no reason why the Supreme Court, once it had faced and decided the basic question of conflicting claims of two great administrative bodies, to jurisdiction, should be presumed to have followed to the bitter end every possible ramification of the claims of the private litigants. The holding of the Court did no more than establish the jurisdiction of the Commission and the validity of the status order.[20] The Court dealt with measures it believed necessary to protect the public from evasion of the Act by a possible wrongdoer. It did not suggest that the wrong be overlooked or that in the absence of any finding that the public interest compelled such action,[21] relief be granted for the benefit of the wrongdoer notwithstanding his wrong.

We have now recognized the Commission's jurisdiction. This unquestionably includes the power to authorize the issue of the preferred stock in question but we hold that although there might be circumstances when such action could reasonably be taken before approving the acquisition of control over the Central system, there were no findings or facts which justify such action in the present case.

Accordingly, judgment must be granted in favor of plaintiffs. A judgment will be entered setting aside the order of the Commission authorizing the issue of the preferred stock and enjoining acts of the defendants in furtherance thereof. Defendants may apply for a thirty day stay of enforcement to enable them to perfect an appeal to the Supreme Court. The preliminary injunction in its present form shall continue until further order of the Court.

Settle order on notice.

---

19. Although the Commission consistently points out that an illegal acquisition does not become protected by the passage of time or the prior knowledge of the Commission or its grant of other applications (see Transcontinental Bus System, Inc.—Investigation of Control, supra, 57 M.C.C. 323, 334), there is no doubt that the disruption of the public service by delayed divestiture will weigh against the exercise of this sanction. See Commercial Petroleum & Transport Co.—Control, supra, 58 M.C.C. 439, 459.

20. The plaintiffs were held not to be interested parties for the purposes of being heard before the entry of the merger and status orders. 353 U.S. 151, 173–175, 77 S.Ct. 763, 775–776.

21. Cf. Division 4 findings, Louisville & J. B. & R. Co.—Merger, supra, 290 I.C.C. 725, 741; Record, op. cit., p. 435.