**WELCH FOODS INC. et al.,**
**Plaintiffs,**

**v.**

**GOLDMAN, SACHS & CO.,**
**Defendant.**

No. 70 Civ. 4811.

United States District Court,
S. D. New York.

Sept. 30, 1974.

**1394**

Pollack & Singer, New York City, for plaintiffs.

Sullivan & Cromwell, New York City, for defendant.

MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiffs, Welch Foods Inc. ("Welch"), a New York corporation, C. R. Anthony Company ("Anthony"), an Oklahoma corporation, and Younker Brothers, Inc. ("Younkers"), a Delaware corporation with its principal place of business in Iowa, allege that in 1970, defendant Goldman, Sachs & Co. sold Penn Central Transportation Company promissory notes ("Penn Central") to them and in so doing violated § 12(2) and § 17(a) of the Securities Act of 1933 (15 U.S.C. §§ 77l, 77q), § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j). The complaint, filed November 4, 1970, also pleads a count based on allegations of common law fraud and a private claim said to arise under the Martin Act, in effect in New York State [New York General Business Law, McKinney's Consol.Laws, c. 20, § 352–c].

Goldman, Sachs, a partnership engaged in investment banking, underwriting and dealing in securities and commercial paper, is a registered broker-dealer, and a member of the New York Stock Exchange and the National Association of Securities Dealers. Its principal place of business is in New York City.

Trial of the issues was commenced before the Court and jury on September 9, 1974, and continues. On September 19, 1974, after plaintiffs had rested, defendant moved to dismiss generally, for failure of proof, and specifically moved to dismiss all claims asserted by Welch, and to dismiss those claims of the other plaintiffs arising under § 17(a) of the 1933 Act and § 10(b) of the 1934 Act, all for lack of subject matter jurisdiction.

Defendant contends that the Court lacks subject matter jurisdiction of Welch's claims under the 1933 Act because the notes were not offered or sold "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails," as required by § 12(2) and § 17(a).

As to all plaintiffs, defendant contends that § 17(a) does not afford a private right of action, and further, that subject matter jurisdiction does not exist under the 1934 Act because the Penn Central notes are "commercial paper" and not within the definition of a "security" contained in § 3(a)(10) of the 1934 Act. Accordingly, it is claimed, the notes are not a "security" for purposes of § 10(b) or Rule 10b–5.

Defendant also asserts that if no federal subject matter jurisdiction exists as to Welch, this Court, as a matter of discretion, should not exercise pendent jurisdiction over Welch's state claim.

*Claims of Welch under the 1933 Act.*

In order for this Court to have jurisdiction over Welch's claims under § 12(2) and § 17(a) of the 1933 Act, the notes of Penn Central must have been offered or sold either (a) by use of the mails, or (b) "by the use of any means or instruments of . . . . communication in interstate commerce." 15 U.S.C. § 77l(2).

Welch did not enter into this particular transaction with Goldman, Sachs as a result of a solicitation by mail. Goldman, Sachs had published and distributed leaflets inviting clients such as Welch to invest in commercial paper, but it cannot be said with certainty that Welch received or acted upon any such mailing in making this particular purchase.

Purchase of these notes was effected by an intrastate telephone conversation between William H. Lomicka, a financial officer of Welch, and Mark Dembrow, a Goldman, Sachs commercial paper salesman. As a result of one or more intrastate phone calls, Welch made the purchase, and directed its bank in New York City, First National City Bank, to credit Goldman, Sachs for the purchase price against delivery of the notes to the Bank, all on the same day. This was the standard procedure followed in such sales.

Immediately after the transaction had been concluded on the phone, and, according to defendant's theory was therefore complete in all respects, Goldman, Sachs caused a "confirmation" to be completed and mailed to Welch, enclosed with so-called green, white and yellow sheets (PX162, 163 and 164), financial data prepared or reproduced by Goldman, Sachs concerning the issuer, Penn Central.

Defendant clearly employed the mails, but the confirmation and the green, white and yellow sheets were not mailed until after the purchase had been agreed upon, and were not received by Welch until a day or more after payment and delivery of the notes. At issue is whether this use of the mails is a sufficiently significant part of the transaction to be relied on for jurisdictional purposes.

I find that under the circumstances of this case, both parties contemplated that a confirmation would be mailed forthwith from Goldman, Sachs to Welch at Westfield, New York, as soon as possible after concluding the telephone call. Indeed, it would have been impossible to conduct or complete this sort of transaction if prompt receipt of this documentation at the home office of the purchaser was not contemplated. Otherwise, purchaser would be in a position of having had its New York City bank account debited for a substantial amount of money, with no documentation in the office of its treasurer at Westfield, New York to show where the money had gone. The confirmation, in effect, served as a voucher, and under principles of accounting generally followed in American business, it would be impossible for Welch to effect such a transaction solely by telephone. An alternative, of course, would have been the immediate mailing of a vault ticket or receipt for the notes to Welch by its bank, but such a mailing would not have satisfied the normal requirement of a voucher, since the bank had no first-hand basis, except for an undocumented telephone

instruction, to set forth the purchase price thereon, in a way binding seller as to amount.

■ Where, as here, the confirmation of a sale of securities is an integral and essential part of the transaction, it is sufficient to support jurisdiction. The Court recognizes in this regard that there is a factual distinction between a confirmation which is used, as in this case, as a voucher record in the purchaser's accounting procedures, and a confirmation such as is used in the sale of equity securities, where payment or delivery or some similar act is required after receipt of the mailing, and by the settlement date. But this distinction is considered unimportant for jurisdictional purposes.

Use of the mails "to confirm purchases already induced by defendant's deceit" is adequate, and "the mailing need not be central to the fraudulent scheme as it would be in a mail fraud case." *United States v. Cashin*, 281 F.2d 669, 673–74 (2d Cir. 1960); see also *Jaffee & Co. v. S.E.C.*, 446 F.2d 387, 392 (2d Cir. 1971). Decisions under the mail fraud statute are inapposite in the construction of the securities laws. Assuming they applied, a distinction exists which is applicable here. In *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) the Supreme Court reversed a conviction based on the mail fraud statute, holding that the mailings were too remote from, and not part of, the fraudulent scheme. However, the Court noted that where, as here, the mailings might have helped to prevent detection by lulling the victim into refraining from investigating and discovering the fraud, mailing after the consummation of the transaction might support conviction. The mailings in Maze actually assisted in discovering the fraud. Here, confirmation slips accompanied by sheets containing favorable financial information about Penn Central might induce the purchasers to believe they had sufficient relevant background information about the company and thus

need not conduct a separate investigation which might have alerted the purchasers to the true state of affairs of Penn Central and "uncovered" the alleged fraud.

Use of the mails as a part of a sale, even though subsequent to it, appears to be sufficient to sustain jurisdiction.

■ We agree with defendant's contention, however, that use of the mails and interstate telephone calls involved in the purchase by Goldman, Sachs of the Penn Central notes sold to Welch cannot be used as a jurisdictional basis with respect to claims arising out of the sale to Welch. This is so, notwithstanding the fact that there is some evidence the notes or paper sold to Welch were "special order" with respect to maturity and terms, and, of necessity, would have required a specific telephone conversation between Goldman, Sachs' New York commercial paper buying office, and the Treasurer's office of Penn Central, at Philadelphia, Pa. This interstate aspect of the transaction is considered too remote to serve as a basis for jurisdiction.

With respect to the claims of Welch under § 12(2) of the 1933 Act, I am satisfied that subject matter jurisdiction does exist in that the commercial paper was offered or sold "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails". § 12(2) of the Securities Act of 1933 [15 U.S.C. § 77l(2)].

*Are the Penn Central Promissory Notes a "Security" for Purposes of the 1934 Act?*

Defendant contends that these notes are "commercial paper" and accordingly, by statutory definition, not a "security" for purposes of the 1934 Act. Section 3(a)(10) of that Act provides that the term security "means any note . . . but shall not include . . . any note . . . which has a maturity at the time of issuance not exceeding nine months." [15 U.S.C. § 78c(a)(10)].

*Sanders v. John Nuveen & Co.*, 463 F. 2d 1075 (7th Cir. 1972), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), dealing with this precise question, held that such short term commercial paper may be a security subject to the provisions of the 1934 Act, depending on the factual circumstances of the case. Plaintiff in *Sanders* purchased short term promissory notes from defendant broker-dealer. When the corporate issuer became insolvent, plaintiff commenced a class action on behalf of all purchasers against the dealer, relying on anti-fraud provisions of the 1934 Act. Noting the general remedial purpose of all federal securities laws, the Court looked to the definition of "security" in the 1933 Act, and in doing so, the *Sanders* court adopted the four element test spelled out in SEC Release No. 4412 to determine whether the notes, if offered to the public as an investment, were exempted from the 1933 Act. The exemption was held limited, in *Sanders*, and in the Release, only to (1) prime quality negotiable commercial paper, (2) of a type not ordinarily purchased by the general public, that is (3) paper issued to facilitate well recognized types of current operational business requirements, and (4) of a type eligible for discounting by Federal Reserve Banks. Finding that the notes met none of the above criteria, the Court concluded that the notes were not exempted from the anti-fraud provisions of the 1933 or the 1934 Act.

The Court observed that "form should be disregarded for substance and the emphasis should be on economic reality" (463 F.2d at 1077):

". . . Congress intended to protect against fraud the purchasers of securities such as those involved here under the 1934 [A]ct as well.

\* \* \* \* \* \*

In other words, when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities. . . . [A] person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment." 463 F.2d at 1079–80.

Thereafter, in *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795, 800 (2d Cir. 1973), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146, the Court discussed the four element test as it is applied under the 1933 Act and concluded:

"We have no doubt that the [Securities and Exchange] Commission would take the same view with respect to the exclusion in § 3(a)(10) of the Securities Exchange Act. [Citations omitted.] Such a ruling, by an agency charged with the administration of a statute, while not conclusive, is entitled to substantial weight. [Citations omitted.] We thus agree with the decision of the Seventh Circuit in *Sanders v. John Nuveen & Co.*, . . . that the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b–5, unless the note fits the general notion of 'commercial paper' reflected in the SEC Release."

The Court in *Zeller* recognized that all promissory note transactions are not necessarily within its holding, but that the Act seeks protection of investors, and should be construed and applied accordingly. Here, defendant argues that even if commercial paper may be held a security in an appropriate case, these Penn Central notes meet all criteria of the "four element test" and, therefore, sale thereof is not within the provisions of the 1934 Act.

■ We find that the Penn Central notes do not meet the criteria approved in *Zeller, supra*. In the circumstances of this case the notes are securities for purposes of the 1934 Act. We reject defendant's argument that the paper was "prime quality" because it was so rated by the National Credit Office. The private determinations of that branch of Dun & Bradstreet, which does not rate

all issuers, cannot bind plaintiffs or the courts. We believe the Commission used the expression "prime" in the generic sense as defined in Funk & Wagnalls New Standard Dictionary (1949), p. 1967, "first in value or excellence; of excellent quality; first rate," and did not intend thereby to incorporate Dun & Bradstreet's procedures by reference. Furthermore, there is some evidence that National Credit Office of Dun & Bradstreet, rating Penn Central notes as prime, relied improperly on the fact that Goldman, Sachs ostensibly considered the notes creditworthy, and intended to continue to sell them to its valued clients. Enough objective data was known concerning Penn Central in early 1970 to lead a reasonable observer to conclude that the commercial paper was not prime, and indeed the issuer became insolvent very shortly thereafter. This fact alone is some evidence that the paper was not "prime" at the time of sale. See *Sanders, supra,* at p. 1079 of 463 F. 2d.

Defendant's contention that grant of authority for issuance by the Interstate Commerce Commission ("ICC") has some evidentiary value in determining whether or not the notes were "prime," within the *Zeller* criteria, lacks merit. That action had "an important related aim . . . 'to protect the investing public against the dissipation of railroad resources through faulty or dishonest financing'." Sharfman, The Interstate Commerce Commission, Vol. I, pp. 189, 190, quoted with approval in *Breswick & Co. v. United States,* 156 F.Supp. 227, 234, fn. 15 (S.D.N.Y.1957), *rev'd on other grounds,* 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374 (1958). Approval was at most an opinion by the Commission, not necessarily that the notes were prime, but that the issuance thereof would not damage the railroad's financial structure, thereby harming the concurrent interest of the investors. Again, even so regarded, the Commission was wrong, and the commercial paper played a part in the ultimate debacle. Commission staff members, on September 19, 1969 were recorded as having told railroad representatives that (Ex. PX–138):

> "Mattras [of I.C.C.] said—Large or excessive short term borrowings are a traditional cause of bankruptcy. He is concerned there may be a recession and PC will not be able to meet its short term maturities and go bankrupt. Short term borrowings open up a 'Pandora's Box.' He wants to know how far we intend to go—how much more short term borrowings will there be? How will we handle it? He is concerned that our current liabilities exceed our current assets. This is bad. He is not even satisfied that the revolving credit maturities over a 5-year period will protect us. This in his opinion also is dangerous. They do not want an oral response from a financial man; they want a written reponse."

Defendant does not suggest that the terms "creditworthy" and "prime" are synonymous nor could it.

Our jury may determine upon all the evidence here whether Penn Central's notes, judged objectively, or subjectively, in the opinion of the defendant, were prime or creditworthy at the relevant dates of purchase by these plaintiffs.

Nor was the Penn Central commercial paper of a type not ordinarily purchased by the general public. Even if the majority of the purchasers of Penn Central notes were large financial institutions who purchased in large amounts, individuals and businesses of medium size could and did purchase the paper, not only directly from Goldman, Sachs, but also through banks and trust companies, which in turn purchased from Goldman, Sachs. Partners of Goldman, Sachs understood that these banks were purchasing not solely for their own account, but for the account of various banking customers, including individuals, personal trusts and business firms.

The definition of the term "general public" should not be narrowly construed. Large as well as small investors

are protected by the Securities Acts. "[S]ophisticated investors, like all others, are entitled to the truth." *Stier v. Smith,* 473 F.2d 1205, 1207 (5th Cir. 1973).[1]

That the proceeds of the Penn Central commercial paper were being used directly or indirectly to fund past capital expenditures and matured debt obligations, rather than for traditional current expenses, was a fact known even to the Interstate Commerce Commission, which authorized their sale. The notes therefore do not meet the two additional criteria set forth in *Zeller, supra,* that the proceeds must be issued to facilitiate well recognized types of current operational business expenses and the notes must be of a type eligible for discounting by Federal Reserve Banks. With respect to such banks, 12 C.F.R. § 201 requires, *inter alia,* that the current expenses standard must be satisfied for commercial paper to be eligible for discounting.

Defendant points out, correctly, that the notes are exempt from registration under the 1933 Act pursuant to § 3(a)(6). However, exemption from registration under this section of the 1933 Act does not immunize a seller from operation of the antifraud provisions of the 1934 Act. In *Baron v. Shields,* 131 F.Supp. 370 (S.D.N.Y.1954), such jurisdiction was upheld although the issuer was a political subdivision and therefore exempt under § 3 of the 1933 Act. In *Glen-Arden Commodities, Inc. v. Costantino,* 493 F.2d 1027 (2d Cir. 1974) it was held that whiskey receipts are securities for Rule 10b–5 purposes, stating, "the federal securities laws are to be construed 'not technically and restrictively, but flexibly to effectuate [their]

remedial purposes.' . . ." 493 F.2d at 1033.

As sold to these three plaintiffs, the notes sued on are within the 1934 Act. *Implied Right of Action under § 17(a) of the 1933 Act.*

Defendant contends that § 17(a) of the 1933 Act does not on its face create any private right of action and that the question of the existence of an implied right of action thereunder is at the very least, an open question. This conclusion seems correct.

In *Globus v. Law Research Service,* 418 F.2d 1276, 1283 (2d Cir. 1969), the Court of Appeals considered whether plaintiff, who had a valid action under § 10(b) of the 1934 Act, and Rule 10b–5, could recover on the same facts under § 17(a) and add punitive damages. The Court avoided a clear holding, in manner following:

"Since we affirm only the award of compensatory damages, which could stand either on the basis of § 10(b) of the 1934 Act or § 17(a) [of the 1933 Act], we need not tarry over whether § 17(a) standing alone would support an action for compensatory damages. . . . [T]here seems little practical point in denying the existence of an action under § 17 once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act."

Later, in *Superintendent of Insurance v. Bankers Life & Co.,* 430 F.2d 355 (2d Cir. 1970), *rev'd on other grounds,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), another panel held at dictim (at p. 359) that "Section 17(a) of the 1933 Act provides a cause of action only for a defrauded purchaser," and then went on

1. We consider these plaintiffs as investors having no greater expertise than the general public. The principal business of Welch is that of a food processing cooperative organized for the benefit of grape growers of the Finger Lakes Region. Younkers operates a chain of department stores in the Midwest as does Anthony. Each of these corporations had a full-time financial officer and at various times of the year, invested substantial amounts in short-term paper. But we cannot rank their financial expertise or their ability to generate a meaningful credit file equivalent to that specialized knowledge possessed by the banks, who for many years were practically the sole purchasers of this class of investment.

to determine that plaintiff was not a purchaser.

Judge Gignoux of Maine has made an excellent argument to the contrary. In *Dyer v. Eastern Trust and Banking Company*, 336 F.Supp. 890, 903 (D. Maine, 1971) he held:

"There clearly is no explicit civil remedy provided for by Section 17(a); it is a criminal provision and, therefore, a private cause of action under that section which is brought independently of Section 12(2) can only be based upon "the general principle of tort law that violation of a provision of a criminal statute can, unless expressly or impliedly negatived by the statute itself, give rise to a civil remedy in tort." Trussell v. United Underwriters Ltd., 228 F. Supp. 757, 765 (D.Colo.1964); cf. Restatement, Second, Torts, § 286. The question presented has not been determined by the Supreme Court and is apparently one of first impression in this Circuit. It is true that some courts have assumed, without deciding, that a private civil remedy exists under Section 17(a) (*see, e. g., Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1056 n. 10 (2d Cir. 1969); *Johns Hopkins University v. Hutton*, 326 F. Supp. 250 (D.Md.1971); *Globus v. Law Research Service, Inc.*, 287 F. Supp. 188, 194 (S.D.N.Y.1968), modified, 418 F.2d 1276 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970)), and other courts have expressly recognized the existence of such a remedy (*see Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 787 n. 2 (2d Cir. 1951) (dictum); [19] *Larson v. Tony's Invest-*

19. Despite the *Katz* footnote and the *Fischman* dictum, the existence of a private action under Section 17(a) remains an open question in the Second Circuit. See *Globus v. Law Research, Inc.*, 418 F.2d *supra*, at 1283.

*ments, Inc.*, 46 F.R.D. 612 (M.D.Ala. 1968); *Dack v. Shanman*, 227 F.Supp. 26, 28–29 (S.D.N.Y.1964)). But other courts have denied a private remedy under Section 17(a), at least where the operative facts alleged are such as to come within Section 12(2). *Trussell v. United Underwriters Ltd., supra*, 228 F.Supp. at 768–769; *Weber v. C. M. P. Corp.*, 242 F.Supp. 321, 323 (S.D.N.Y.1965); cf. *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 790 (8th Cir. 1967). And Judge Friendly, in his concurring opinion in *S. E. C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 864 (2d Cir. 1968), *cert. denied, Coates v. S. E. C.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), has taken the position that Section 17 was not intended to be the basis of any private actions; that, on the other hand, there seems little practical point in denying a private action under Section 17 once it is established that a buyer has an action under Section 10(b) of the Exchange Act, "with the important proviso that fraud, as distinct from mere negligence, must be alleged"; [20] and that to

20. Even those courts which have implied a civil emedy under Section 17(a) have done so only where fraud, as distinct from mere negligence was present. *Trussell v. United Underwriters Ltd., supra; Fischman v. Raytheon Mfg. Co., supra;* see *Weber v. C.M.P Corp., supra;* 6 Loss, Securities Regulation 3914 (2d ed. Supp.1969). No fraud is alleged in Count II of the instant complaint.

go further "would totally undermine the carefully framed limitations imposed on the buyer's right to recover granted by § 12(2) of the 1933 Act." *Id.* at 867–868. The argument, based upon both legislative history and statutory construction, is persuasive that Section 17(a) was intended only to afford a basis for injunctive relief and, if wilfulness is present, for criminal liability, and was not intended to provide a civil remedy for damages supplementing that afforded by Section 12(2). It is cogently stated by Professor Loss:

. . . In November 1933 Commissioner Landis of the Federal Trade Commission, who had played

a prominent part in the drafting of the statute, stated in an address:

> The suggestion has been made on occasion that civil liabilities arise also from a violation of Section 17, the first subsection of which makes unlawful the circulation of falsehoods and untruths in connection with the sale of a security in interstate commerce or through the mails. But a reading of this section in the light of the entire Act leaves no doubt but that violations of its provisions give rise only to a liability to be restrained by injunctive action or, if wilfully done, to a liability to be punished criminally.

Although this was said many years before the *Kardon* case, there is nothing novel about the doctrine of implied tort liability based on violation of a statute. The question is simply whether there is the same justification for implying such liability under the 1933 act as there is under the 1934 act. It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b) and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created by §§ 11 and 12. The 1933 act is a much narrower statute. It deals only with disclosure and fraud in the sale of securities. It has but two important substantive provisions, §§ 5 and 17(a). Noncompliance with § 5 results in civil liability under § 12 (1). Faulty compliance results in liability under § 11. And § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act) are all-embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in

those sections and the differences between them—for example, the fact that § 11 but not § 12 imposes liability on certain persons connected with the issuer without regard to their participation in the offering and the fact that § 12(2) does not go so far in relation to § 17(a) as § 12(1) goes in relation to § 5—make it seem the less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a). Particularly is this so in view of the fact that § 11, together with the statute of limitations in § 13, was actually tightened in the 1934 amendments to the Securities Act. 3 Loss, Securities Regulation 1784–85 (2d ed. 1961).

In Count II of the present complaint, plaintiff has stated a cause of action under Section 12(2) of the Securities Act and the same operative facts are alleged in support of her Section 17(a) claim. The better view, which is adopted by this Court, is that under these circumstances plaintiff cannot sustain a separate cause of action under Section 17(a).

The claims pleaded under § 17(a) are dismissed.

*Pendent Jurisdiction.*

If the jurisdictional points previously discussed were to be resolved adversely to plaintiff Welch, we are faced with the question whether its state claims pleaded justify exercise of our pendent jurisdiction. This "involves two discrete inquiries: whether the court has the 'power' to hear the state claim; and whether, assuming the power, the court should, as a matter of 'discretion', hear the state claim." *Leather's Best, Inc. v. S. S. Mormaclynx,* 451 F.2d 800, 809 (2d Cir. 1971). Judicial power exists whenever the relationship between the federal "claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case'." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d

218 (1966). The justification for the exercise of this power "lies in considerations of judicial economy, convenience and fairness to litigants." *United Mine Workers v. Gibbs, supra*, at 726, 86 S.Ct. at 1139. As held in *Gibbs*, at 725, 86 S. Ct. at 1138:

> "The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole."

*Ryan v. J. Walter Thompson Company*, 453 F.2d 444 (2d Cir. 1971), upheld the district court's adjudication of a pendent state claim after dismissing the cause of action based on the anti-fraud provisions of the federal securities laws. Thereafter, the Court of Appeals cautioned in *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974) against the exercise of pendent jurisdiction in securities cases "absent exceptional circumstances" but indicated that such a circumstance may be found when there has been a substantial investment of the time and efforts of the Court and litigants before resolution of the federal claims adversely to a plaintiff, and when the pendent claim invokes significant questions of federal policy; or when dismissal of the pendent claim would contravene the *Gibbs* directive that pendent jurisdiction serve the ends of judicial economy, convenience and fairness.

█ In the instant litigation, Welch's pendent claims have a common nucleus of fact with its federal claims and with those of the other plaintiffs in this action. The facts deemed common are those bearing upon (1) the creditworthiness in 1969–70 of Penn Central, (2) whether nor not Goldman, Sachs possessed adverse non-public information affecting the merchantability of creditworthiness of the Penn Central's notes, (3) whether the notes were in fact "prime", and if they were not, (4) whether Goldman, Sachs knew of their infirmities; (5) should have known; or (6) conducted itself in a reckless manner so that its customers did not learn the truth.

These factual questions are so intimately related as between the various disgruntled purchasers, and as between Welch's state and federal claims, that it would indeed frustrate all considerations of judicial economy, convenience and fairness to litigants, if, while these federal cases proceed to trial sequentially and one at a time, Welch and Goldman, Sachs should be relegated to trying the same facts in the Supreme Court of Chatauqua County, New York, or elsewhere.

We turn now to the question of whether under *Kavit, supra*, there has been a substantial investment of judicial time and resources. Reference to our docket sheets and the record of the Judicial Panel on Multidistrict Litigation show beyond peradventure that this case and the related cases in this Court and elsewhere have received extensive judicial attention for almost four years. Elaborate pre-trial discovery has been held, and there have been numerous pre-trial conferences held by or pursuant to the direction of the Multidistrict Judge. This is one of a substantial number of lawsuits pending in federal courts throughout the nation, brought by note purchasers against this defendant which was the sole dealer in Penn Central's commercial paper.

On January 11, 1974, after almost four years of pre-trial skirmishing, all the cases were remanded for trial. The Court of Appeals in this Circuit held [*Goldman, Sachs & Co. et al. v. Edelstein*, 494 F.2d 76 (2d Cir. 1974)] that:

> "Both cases [this and *Franklin Savings Bank v. Levy, et al, d/b/a Goldman, Sachs & Co.*] raise identical claims based on substantially the same proof against Goldman, Sachs and are two of fifteen similar cases pending in the Southern District

of New York which were consolidated for pretrial discovery purposes by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407.

*Welch* was the earliest case filed. It asserts by far the largest claim and from the outset has been treated by the court and by the parties as the 'bellweather' [sic] case for trial. The record reveals that for many months prior to February 26, 1974, all parties in the consolidated cases proceeded on that basis, with discovery in *Welch* being conducted on a more accelerated schedule than in the other cases."

[Matter in brackets added.]

The jurisdictional questions were pleaded as affirmative defenses in the answer in this and all actions. No formal pre-trial motion was made in this case, but in the related *Franklin* case mentioned above, Goldman, Sachs did move orally before the assigned judge to dismiss on identical grounds, applicable here to Welch. The Court in *Franklin* (71 Civ. 882) concluded that in the interests of economy of judicial effort, the motion should be deferred until the close of plaintiff's case at trial. Tacitly, this direction became the guide for all parties in the many other Penn Central commercial paper cases. Accordingly, the issue was not resolved in this case prior to trial.

The trial of this case was first scheduled for a day certain in March, 1974. There have been various reschedulings since. There was ample opportunity during that entire time to make a formal motion, on the part of plaintiff to strike out the affirmative defense, or on the part of defendant to dismiss as to Welch.

The jurisdictional issues raised are difficult and real; their resolution not free from doubt. All those policy considerations which warrant the exercise of pendent jurisdiction are amply present under the circumstances of this case, and if the Court were to sustain the jurisdictional objections raised with respect to any of Welch's claims [which we do not], we would proceed nevertheless to exercise pendent jurisdiction to the extent of continuing the trial through verdict and judgment on Welch's pendent claims.

*Other Matters.*

Decision is reserved on defendant's motion to dismiss the common law claims of Welch and its claims under the Martin Act (§ 352–c, Gen.Bus.Law), These motions may be renewed at the close of defendant's case.

*Conclusion.*

That portion of the Second Count alleged pursuant to § 17(a) of the Securities Act of 1933 is dismissed on defendant's motion. Except for those matters reserved, defendant's motion is in all other respects denied.

So Ordered.