**Sandor SCHWARTZ, Plaintiff,**

v.

**Robert J. BOWMAN et al. and the Chesapeake & Ohio Railway Co.,
Defendants.**

United States District Court
S. D. New York.
July 19, 1965.

J. Milton Fainer, New York City, for plaintiff; Sidney L. Garwin, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendants, Cyrus S. Eaton, Walter J. Tuohy and Cyrus S. Eaton, Jr.; Carl E. Newton, Helmut F. Furth, M. Lauck Walton, Edward F. McCabe, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant, Anita O'Keeffe Young, executrix of the estate of Robert R. Young, deceased; Thomas F. Daly, Robert D. Bentley, New York City, of counsel.

Watters & Donovan, New York City, for defendant Alleghany Corp.; James M. Fitzsimons, Thomas D. Wellington, New York City, of counsel.

Kissam & Halpin, New York City, for defendant Allan P. Kirby; Leo T. Kissam, Anthony S. Genovese, New York City, of counsel.

Satterlee, Warfield & Stephens, New York City, for defendant Clinton W. Murchison; Henry J. Formon, Jr., New York City, of counsel.

John Howley, New York City, for defendant Chesapeake & Ohio Ry. Co.

FREDERICK van PELT BRYAN, District Judge:

Plaintiff, the holder of 100 shares of common stock of The Chesapeake & Ohio Railway Company (C. & O.), brings this derivative action on behalf of C. & O. against Alleghany Corporation (Alle-

ghany), various persons who are or were officers and directors of either Alleghany or C. & O. or both and the executrix of a deceased director. C. & O. is named as a nominal defendant.

Jurisdiction over the subject matter is alleged to be based on § 44 of the Investment Company Act of 1940, 15 U.S.C. § 80a–43, and diversity of citizenship, 28 U.S.C. § 1332(a).

Service on defendants Eaton, Eaton, Jr., Tuohy, Murchison and the Young executrix was made outside the State of New York under purported authority of § 44 of the Investment Company Act. Defendants Kirby and Alleghany were both served in New York. The nominal defendant C. & O. appeared generally. The other defendants named have not been served.

This litigation and the related case of Annenberg v. Alleghany and C. & O. (Civ. 135–152) were commenced in January 1957 and July 1958, respectively. Both cases attack the same transaction between Alleghany and C. & O., this case being brought by a stockholder of C. & O. and the other by a stockholder of Alleghany. Motions to dismiss on similar grounds in both cases were argued at the same time before me, and counsel in both submitted joint papers in opposition.

Both cases relate to transactions in 1954 by which Alleghany relinquished control of C. & O. and acquired control of the New York Central Railroad Company (Central). Various questions involved in these two suits have been before the Interstate Commerce Commission, the Securities and Exchange Commission, federal district judges, a three judge court, the court of appeals for this circuit, the United States Supreme Court and the New York State Courts, on numerous occasions over a period of more than ten years. See Chesapeake & Ohio Ry. Purchase, 261 I.C.C. 239 (1945), 271 I.C.C. 5 (1948); Louisville & J. B.

& R. R. Merger, 290 I.C.C. 725, aff'd, 295 I.C.C. 11 (1955); Alleghany Corp., 20 S.E.C. 731 (1945), 37 S.E.C. 424 (1956); Breswick & Co. v. Briggs, 130 F.Supp. 953 (S.D.N.Y.), 135 F.Supp. 397 (S.D. N.Y. 1955); Breswick & Co. v. United States, 134 F.Supp. 132 (S.D.N.Y.1955), 138 F.Supp. 123 (S.D.N.Y. 1956), (per curiam) rev'd, sub nom. Alleghany Corp. v. Breswick & Co. 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726, 156 F.Supp. 227 (S.D. N.Y. 1957) rev'd, per curiam sub nom. Alleghany Corp. v. Breswick & Co., 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374, 160 F.Supp. 754 (S.D.N.Y. 1958); Neisloss v. Bush, 110 U.S.App.D.C. 396, 293 F.2d 873 (D.C.Cir. 1961); Schwartz v. Bowman, 156 F.Supp. 361 (S.D.N.Y. 1957), appeal dismissed sub nom. Schwartz v. Eaton, 264 F.2d 195 (2 Cir. 1959); Zenn v. Anzalone, 1 A.D.2d 662, 146 N.Y.S.2d 286 (1st Dep't 1955) (per curiam), leave to appeal denied, 1 A.D.2d 773, 149 N.Y. S.2d 213 (1st Dep't 1956), 4 A.D.2d 945, 168 N.Y.S.2d 479 (1st Dep't 1957) (per curiam), 17 Misc.2d 897, 191 N.Y.S.2d 840 (Spec. Term, N. Y. County 1959), appeals dismissed without opinion, 11 A. D.2d 938, 210 N.Y.S.2d 748 (1st Dep't 1960); Freeman v. Kirby, 27 F.R.D. 395 (S.D.N.Y. 1961); Murchison v. Kirby, 27 F.R.D. 14 (S.D.N.Y.), 201 F.Supp. 122 (S.D.N.Y. 1961); Alleghany Corp. v. Kirby, 218 F.Supp. 164 (S.D.N.Y. 1963), aff'd, 333 F.2d 327 (2 Cir. 1964), aff'd en banc by an evenly divided court, 340 F.2d 311 (2 Cir.), cert. granted sub nom. Holt v. Kirby, 85 S.Ct. 1772, 14 L. Ed.2d 698 (June 1, 1965), 344 F.2d 571 (2 Cir.), cert. granted sub nom. Holt v. Alleghany Corp., 85 S.Ct. 1772, 14 L.Ed. 2d 698 (June 1, 1965).[1] The issues have become increasingly complicated through this maze of litigation.

On January 19, 1954, Alleghany sold 104,854 shares of C. & O. stock, which represented a controlling interest in C. & O., to defendant Eaton. On February

---

1. This plethora of judicial opinions represents but one aspect of the litigation that prompted Judge Friendly to remark, "The affairs of Alleghany Corporation, from its founding by the Van Sweringen brothers in 1929, have given rise to a flood of litigation that must be unparalleled in American corporation law." Willheim v. Murchison, 342 F.2d 33, 35 (2 Cir. 1965).

23, 1954, C. & O. sold 800,000 shares of Central stock to defendants Murchison and Richardson, who are alleged to be nominees of Alleghany. The sale of the Central stock enabled Alleghany to oust the then current management of Central and to obtain control of that railroad system on May 26, 1954.

The complaint in the case at bar proceeds upon the theory that the sale of Central stock by C. & O. to Alleghany was void under § 47 of the Investment Company Act, 15 U.S.C. § 80a–46, because Alleghany was then an investment company which had failed to register with the SEC as the act required. It asserts a claim under the Investment Company Act for rescission of the Central transaction between Alleghany and C. & O.

The complaint alleges that both the sale of C. & O. stock to Eaton and the sale of Central stock to Alleghany nominees were carried out pursuant to a conspiracy by the individual defendants and Alleghany to enable Alleghany to gain control of Central and for their own profit and aggrandizement. As part of the scheme Alleghany is alleged to have sold its block of 104,854 shares of C. & O. to Eaton at an inadequate price. By virtue of the control of C. & O. thus obtained Eaton is alleged to have then caused C. & O. to sell to the Alleghany nominees the 800,000 shares of Central at an inadequate price.

Plaintiff seeks to have the Central transaction set aside, and to compel the individual defendants and Alleghany to account to C. & O. for profits and damages. He also seeks to have Eaton account to C. & O. for alleged profits on his purchase of C. & O. stock from Alleghany on what is apparently a common law corporate opportunity theory.

The answers admit the two transactions took place but in substance deny all other material allegations of the complaint, including the assertion of federal jurisdiction under the Investment Company Act and the sufficiency of the claim for relief under that act.

Each of the defendants has moved for dismissal of the complaint and for summary judgment pursuant to Rules 12(b) and 56(b), F.R.Civ.P., on a variety of grounds, a number of which are common to all.

Defendants all contend (1) that this court lacks jurisdiction to entertain the action because the subject matter is under the primary jurisdiction of the Interstate Commerce Commission and the action necessarily involves an attack on outstanding orders and decisions of the Commission with respect to that subject matter; (2) that under these orders and decisions of the ICC Alleghany was subject to regulation under the Interstate Commerce Act and therefore was expressly exempt from the Investment Company Act; (3) that assuming Alleghany was subject to the Investment Company Act, plaintiff has no claim for relief under that act and (4) that if there is no jurisdiction under the Investment Company Act or no claim for relief under that act, any pendent non-federal claim against defendants necessarily falls.

I. The federal aspects of the complaint.

The sole federal ground for relief alleged in the complaint is based on the Investment Company Act of 1940.

The foundation on which the claim under the Investment Act rests is (a) that at the time C. & O. sold the 800,000 shares of Central to Alleghany nominees, Alleghany was an investment company required to register with the SEC under the Investment Company Act; (b) that Alleghany failed so to register; and (c) that in consequence the Central transaction was void under the terms of that act. Upon this foundation plaintiff asserts that a claim on behalf of C. & O. arose under the Investment Company Act for rescission of the Central transaction and an accounting by the defendants for profits and damages.

Assuming the basic premises, there are, as the defendants urge, serious questions here as to whether plaintiff suing on behalf of C. & O. has status to sue under the Investment Company Act on transactions of this nature, and, even if he has such status, whether he is entitled to relief under that act absent a demonstrated

causal connection between the violation of the act alleged and the damages suffered. See Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y. 1965), and cases there cited. Before such questions are reached, however, it must be determined whether the foundation on which the claim under the Investment Company Act is based is sound and, indeed, whether this court has jurisdiction to consider that question at all.

Plainly, if Alleghany was not subject to the Investment Company Act when the transactions complained of took place, it was under no duty to register with the SEC, the basic premise falls and the claim under the Investment Company Act falls with it.

Defendants assert that the ICC by a succession of orders and decisions has determined that at all times relevant here Alleghany was subject to regulation under the Interstate Commerce Act and was exempt from the Investment Company Act by its very terms and was not subject to SEC regulation or required to register with the SEC. These orders, say the defendants, confirmed by orders and action of the SEC, are binding on this court.

If they are correct in this contention plaintiff's basic premise is wrong and the claim under the Investment Company Act cannot stand.

Equally plainly, if this court has no jurisdiction in this action to pass on the question of whether Alleghany is subject to ICC Act regulation and therefore exempt from the Investment Company Act, plaintiff's basic premise must fall likewise with the same consequences. For in order to succeed on his theory plaintiff must necessarily have a determination from this court that Alleghany was subject to the Investment Company Act and failed to comply with the legal requirements thereunder. Unless the court has jurisdiction to make such a determination in this action the plaintiff cannot succeed under the Investment Company Act.

The question of jurisdiction to entertain the action must come first.

Defendants urge that under the Interstate Commerce Act the ICC has been entrusted with primary jurisdiction to determine the regulatory status of Alleghany and has determined that it was subject to Interstate Commerce Act regulation. The orders and decisions to this effect made by this public body in the public interest, whether right or wrong, say the defendants, may not be directly or indirectly attacked in a private litigation. They may be contravened or set aside only in an appropriate action under Chapter 157 of the Judicial Code, 28 U.S.C. §§ 2321–2325 (hereafter referred to for purposes of convenience as the Urgent Deficiencies Act) brought against the United States and in which the ICC may be heard as of right. Unless and until the controlling ICC orders and decisions are so reviewed and on review annulled or set aside, they are binding; and this court lacks jurisdiction to contravene them or to give any relief which would have that effect.

Thus, the threshold jurisdictional question presented is three pronged:

(1) Did the outstanding orders and decisions of the ICC determine that at all relevant times Alleghany was subject to regulation under the Interstate Commerce Act and was therefore, under the express terms of the Investment Company Act, not an investment company which was required to register with the SEC?

(2) Does the private action at bar necessarily involve directly or indirectly an attack on the validity of such orders and decisions?

(3) If so, has this court subject matter jurisdiction to grant relief under the Investment Company Act, the only federal basis for relief alleged in the complaint?

(a) The outstanding orders and decisions of the ICC.

Section 3 of the Investment Company Act of 1940, 15 U.S.C. § 80a–3, defines an "investment company" and then provides in subsection (c) that, notwithstanding that definition, "none of the following

persons is an investment company within the meaning of this subchapter: * * * (9) Any company subject to regulation under the Interstate Commerce Act * * *."

All parties are agreed that for some eight and a half years prior to January 19, 1954, Alleghany was considered as a carrier, was subject to regulation under the Interstate Commerce Act and was not an investment company subject to the requirements of the Investment Company Act. Orders of the ICC expressly placed it under Interstate Commerce Act regulation, and the SEC held that it was therefore exempt from the Investment Company Act.

During that entire period Alleghany controlled C. & O., one of the leading eastern railroad systems. It also held a controlling stock interest in the Pittston Company, the owner of all of the stock of the United States Trucking Company, a major interstate trucking carrier, which, pursuant to ICC order, was held by an independent voting trustee. Alleghany also held a substantial stock interest in the Missouri Pacific Railroad Company, which was in reorganization under the Bankruptcy Act.

On January 19, 1954 Alleghany sold its controlling interest in C. & O. to Eaton. On February 23, 1954 the transaction sought to be set aside took place when C. & O. sold 800,000 shares of Central to defendants Murchison and Richardson, allegedly as Alleghany nominees. The relevant time period here thus runs from January 19, 1954 to February 23, 1954.

I turn then to the orders of the ICC which are detailed in the affidavits submitted in support of these motions to ascertain what the ICC determined as to the regulatory status of Alleghany at the times relevant here. In this discussion reference will also be made to orders and actions of the SEC bearing on the same subject matter.

On September 5, 1944, Alleghany, which had been registered with the Securities and Exchange Commission as an investment company since 1940, applied to the ICC for approval of its acquisition of control over designated railway companies and of certain proposed financial transactions pursuant to § 5(2)(a)(i) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(a)(i). That section provides for approval by the Commission

"[F]or a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise."

Section 5(3) of the Act, 49 U.S.C. § 5(3), provides that

"Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2) of this section, to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to such of the following provisions * * *."

as may be applicable. The applicable Interstate Commerce Act provisions include §§ 20(1)–(10) and 20a(2)–(11), 49 U.S.C. §§ 20(1)–(10), 20a(2)–(11), which cover reports, records, accounting methods, issuance of securities and assumption of liabilities and fiduciary duties of officers and directors.

On June 5, 1945 Division IV of the ICC approved Alleghany's application. Chesapeake & Ohio Railway Company Purchase, etc., 261 I.C.C. 239 (1945). The decision discussed in detail the prior connections between Alleghany and a number of carriers, the financial status of Alleghany and the questions of public interest involved in the application for control. It held (pp. 261–262):

"The comprehensive showing in the record on the question of public interest is convincing that Alleghany's application, as amended,

should be granted. This is particularly true in view of said broad powers under the act to impose conditions and retain jurisdiction over the subject matter as a means of protecting the public interest.

\* \* \* \* \* \*

"We further find that Alleghany should be considered as a carrier subject to the provisions of section 20(1) to (10) and sections 20a(2) to (11) of the act."

" \* \* \* [W]e shall retain jurisdiction to make such further order or modification of the order to be entered herein as may hereafter be necessary or appropriate."

The order entered by the Commission on this decision provided that "unless and until otherwise ordered by this Commission Alleghany Corporation shall be considered as a carrier subject to" the provisions of the Interstate Commerce Act applicable under its decision.

The order further provided, pursuant to the Commission's decision, that Alleghany deposit with an independent voting trustee the stock which it held in the Pittston Company as well as all voting stocks of any other carrier corporations subject to Interstate Commerce Act regulation except C. & O. and the Missouri Pacific, which was then in reorganization. Alleghany could regain its voting rights over the Pittston stock only upon a finding by ICC that it no longer controlled C. & O. If Alleghany acquired any voting stock in Missouri Pacific as a result of the reorganization that was to be placed in a voting trust also.

Alleghany had also applied to the SEC for an order declaring that it had ceased to be an investment company within the meaning of the Investment Company Act since it was subject to Interstate Commerce Act regulation. After a public hearing the Commission granted the application, Alleghany Corporation, 20 S.E.C. 731 (1945), and issued an order declaring that Alleghany "has ceased to be and is not now an investing company

within the meaning of the Investment Company Act of 1940" and providing:

"that the registration of Alleghany Corporation under the Investment Company Act of 1940 shall forthwith cease to be in effect, *provided, however,* that if in the future Alleghany Corporation ceases to be subject to regulation under the Interstate Commerce Act as set forth in such Findings and Opinion, this order may be revoked, suspended or modified *after appropriate notice and opportunity for hearing.*" (Emphasis added.)

The SEC has certified that the order was not revoked, rescinded or modified between October 5, 1945, when it was entered, and December 9, 1955, more than a year and a half after the New York Central transaction took place.

There is no dispute that the ICC order of June 5, 1945, was in full force and effect on January 19, 1954 when Alleghany sold its C. & O. stock to Eaton. The C. & O. board met on that day. The six Alleghany directors resigned. All of the vacancies except one were filled with new directors and Eaton was elected chairman. Steps were to be taken to eliminate all contractual, lease and joint salary arrangements between the two companies and fully to sever connections.

A little more than a week later, on January 27, 1954, C. & O. advised the ICC by letter of what had occurred at the January 19th meeting including the sale of the C. & O. stock to Eaton, the relinquishment of C. & O. control by Alleghany and the steps which were under way to complete the severance of connections between the two companies.

On January 28, 1954 Alleghany wrote to the ICC in similar terms. The letter also informed the ICC that Alleghany had been advised that it would be "free to acquire stock ownership in or control of another carrier," but that the Pittston stock would continue to be held in the voting trust.

On February 5, 1954 the chairman of the ICC acknowledged receipt of Alleghany's letter of January 28. He specifically called attention to the provisions in the order of June 5, 1945 that "unless and until otherwise ordered" by the Commission Alleghany was "considered as a carrier subject to" the regulatory provisions of the Interstate Commerce Act.

By letters of February 6 and March 31, 1954 C. & O. informed the ICC of further steps which had been taken to sever the connections between it and Alleghany. The March 31 letter also advised the Commission that, in a separate communication C. & O. was reporting the sale of its 800,000 shares of New York Central stock on February 23, 1954, and asked to have that letter treated as a final report on the voting trust of that stock set up pursuant to the June 5, 1945 order. The March 31 letter was acknowledged by the ICC chairman on April 5, 1954.

In the meantime, on March 2, 1954, a week after C. & O.'s sale of its Central stock to Alleghany, a petition was filed with the ICC by Central requesting that the Commission investigate on its own motion the question of whether Alleghany still controlled C. & O., and whether the sale of the New York Central stock by C. & O. to Murchison and Richardson on February 23 violated the June 5, 1945 order. This was apparently a move by the New York Central management to head off the proxy fight for control of New York Central by the Alleghany interests, which was under way.

On April 6, 1954, the ICC denied Central's petition on the ground that its inquiries disclosed no reasonable evidence on which to question the validity of Alleghany's divestiture of control of C. & O., or the C. & O. sale of Central stock, though the Commission specifically refrained from passing on the propriety or legality of the impending acquisition by Alleghany of control over Central.

On the same day Central petitioned the ICC for an order declaring that the acquisition of New York Central stock by Alleghany and the prospective acquisition of control of Central violated the Interstate Commerce Act unless approved by the Commission under § 5(2)(a)(i). The petition was supplemented on April 13 and various parties in interest on the side of the Central management intervened. On May 18, 1954, after argument, the ICC in the exercise of its discretion denied the petition on the grounds that "to do otherwise would not advance justice."

Further complaints alleging that Alleghany and C. & O. and various of their directors were attempting to control both Central and Chesapeake in a common interest in violation of the Act, filed on May 7 and May 13, 1945, were still pending on May 26, 1954 when, after a strenuous proxy fight which attracted wide public attention, Alleghany acquired control of New York Central. On May 21, 1954, five days before, Alleghany had sold all of its interest in the Pittston stock on deposit with the independent voting trustee.

In view of the proceedings and complaints concerning Alleghany's disposal of its C. & O. holdings and the severance of its C. & O. connections, on July 22, 1954, Division IV of the ICC ordered Alleghany to show cause why the order of June 5, 1945, subjecting Alleghany to ICC jurisdiction, should not be vacated and "Alleghany should no longer be considered a carrier for the purpose of the aforesaid subsections of sections 20 and 20a of the act * * *." On July 23, 1954, at the request of Alleghany, the Commission withheld action on the order to show cause for 60 days to permit the filing of an application by Alleghany, New York Central and two of its subsidiaries to obtain approval for a merger of Central subsidiaries and other relief. Such applications were filed on September 20, 1954, and Alleghany petitioned for "continuation of * * * [its] status as a carrier subject to" the applicable regulatory sections of the act. On September 28, 1954 the SEC intervened in opposition to the continuation by the ICC of Alleghany's status as a carrier subject to the act.

Prior thereto, on July 7, 1954, the SEC had instituted a proceeding to determine whether to revoke its order of October 4, 1945, in which it declared that Alleghany had ceased to be an investment company within the meaning of the Investment Company Act since it was subject to Interstate Commerce Act regulation. On October 18, 1954 the SEC postponed this proceeding pending a decision by the ICC in the proceedings before it in which the SEC had intervened.

On March 2, 1955, Division IV of the ICC approved the application for approval of the merger of the Central subsidiaries and other relief. It also approved the application of Alleghany to continue to be considered as a carrier subject to the act, expressly overruling the objections of the SEC in opposition to such continuance. Louisville & J. B. & R. R. Merger, 290 I. C.C. 725 (1955).

Division IV held (1) that the order of June 5, 1945, providing that Alleghany should be considered as a carrier subject to the provisions of the Interstate Commerce Act "unless and until otherwise ordered" necessarily remained in force and effect; (2) that the divestiture by Alleghany of its C. & O. holdings and controlled holdings of other carrier stocks "could not operate to alter the status of Alleghany as a carrier subject to the

Act" without further order of the Commission. 290 I.C.C. at 733. It held the Commission "was warranted in continuing Alleghany in its present status," and that "Alleghany will continue to be considered as a carrier subject to the act, through the vehicle of the Central system in lieu of through the Chesapeake system * * *." 290 I.C.C. at 741, 745. The effective portions of the June 5, 1945 order were to be superseded by the issuance of a similar order in the current proceeding. The order of the same date so provided and terminated the effective portions of the earlier order.

On May 24, 1955 the full Interstate Commerce Commission affirmed the March 2 decision of Division IV. The Commission stated that it was "in general accord with the ultimate conclusion of the Division" and that "Division 4 properly applied the quoted provisions of the act [§§ 20 and 20a]." Louisville & J. B. & R. R. Merger, 295 I.C.C. 11, 12, 18 (1955). Its order of the same date incorporated its opinion and affirmed the order of Division IV.[2]

While the so-called Louisville merger proceedings were pending, on February 18, 1955, Alleghany filed an application with the ICC for leave to issue a new class of preferred stock pursuant to a

2. The June 5, 1945 order of Division IV provided that Alleghany though not a carrier was "to be considered as a carrier" subject to regulation under §§ 20 and 20a of the act "unless and until otherwise ordered" by the Commission. The full Commission affirmed Division IV's holding that the June 5, 1945, order continued in force and effect until superseded by the new Division IV order of March 2, 1955. It also held that approval of acquisition of control of Central by Alleghany was unnecessary because at the time of acquisition on May 26, 1954, Alleghany was "a person not a carrier" as that phrase is used in § 5(2) (a) (i) of the act.

This portion of the Commission's opinion is entirely consistent with its affirmance of the decision of Division IV that Alleghany continued to have carrier status for purposes of §§ 20 and 20a. Even when Alleghany controlled C.

& O., it was "a person not a carrier" under § 5(2) (a) (i). Control of a carrier does not transform a non-carrier into a carrier for purposes of that section. Under § 5(3), however, the Commission has authority to direct that a person not a carrier under § 5(2) (a) (i), such as Alleghany, be considered as a carrier for the regulatory purposes of §§ 20 and 20a. This is what the continuing order of June 5, 1945 accomplished. See generally with reference to § 5(2) (a) (i) Alleghany Corp. v. Breswick & Company, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957); 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374 (1958) (per curiam). It is regulation under § 20a governing the issuance of securities which is at the heart of the exemption under § 3(c) (9) of the Investment Company Act. Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y. April 22, 1965).

voluntary exchange offer authorized by the Alleghany directors and made public.

After Division IV had handed down its decision in the Louisville merger case minority stockholders of Alleghany brought an action in this court against the Alleghany management to enjoin the proposed preferred stock issue and to restrain Alleghany from proceeding further before the ICC on its application for approval of the issue. The action proceeded on the theory that the ICC had no jurisdiction over Alleghany because it was an investment company subject to regulation by the SEC. On April 6, 1955 an application by the plaintiffs in that action for a temporary injunction was denied upon the ground that the action was premature and that plaintiffs were required to exhaust their administrative remedies before the ICC and then proceed by appropriate judicial proceedings to review any adverse ICC decision. Breswick & Co. v. Briggs, 130 F.Supp. 953 (S.D.N.Y. 1955).

On May 26, 1955, two days after the order of the full Commission approving the Louisville merger application, Division IV of the ICC approved the issuance of the preferred stock. On June 22, 1955, the entire Commission affirmed the preferred stock order of Division IV.

It is apparent that the ICC considered that its order of June 5, 1945, subjecting Alleghany to regulation under the Interstate Commerce Act with respect to such matters as the issuance of securities continued in full force and effect up to the entry of Division IV's order of March 2, 1955, in the Louisville merger case despite the sale by Alleghany of its C. & O. stock on January 19, 1954. Division IV expressly so held and was affirmed by the full Commission. Indeed, Alleghany asked the ICC for approval of the preferred stock issue because it believed that it was required to do so by the continuing June 5, 1945 order.

Thus under the decisions and orders of the ICC the June 5, 1945 order was not terminated until March 2, 1955, and re-mained in force and effect throughout all the times relevant in this action. This order continued in effect after January 19, 1954, the date of Alleghany's sale of its C. & O. stock, through February 23, 1954, the date of Alleghany's purchase of the New York Central stock, through the New York Central proxy fight culminating in control of Central by Alleghany on May 26, 1954 and through Alleghany's preferred stock application. Even on March 2, 1955, some ten months later, there was no break in the continuity of Alleghany's subjection to ICC regulation since the new order of that date—in substitution for the June 5, 1945 order—continued Alleghany under ICC regulation on the basis of its control of Central.

It should be noted that during the time period relevant in the case at bar the ICC was informed of the C. & O. divestiture, of the Central stock acquisition, and of the possibility of Alleghany seeking control of Central. Within a week after acquisition of the Central stock proceedings were commenced before the ICC questioning the C. & O. divestiture. Further proceedings of one kind or another raising related issues were continuously before the ICC for more than a year. Moreover, during the relevant period, and after its divorcement from C. & O. Alleghany continued to have other substantial carrier interests in the Pittston Company and in the Missouri Pacific Railroad.

Finally, it is significant that C. & O., on whose behalf the present action is brought, was a party to proceedings before the ICC subsequent to the Central transaction and prior to the Louisville merger proceedings and was given notice of the Louisville proceedings themselves and apparently treated as a party to those proceedings.

Against the background of the determinations by the ICC that Alleghany was subject to Interstate Commerce Act regulation throughout the period relevant here, I turn to the rather confusing litigation to review the decisions of the ICC in the Louisville merger case and approving Alleghany's preferred stock issue.

(b) The action under the Urgent Deficiencies Act to review the ICC determinations.

After the decision of the full Interstate Commerce Commission in the Louisville merger case on May 24, 1955, Breswick & Co. and Phillips, two minority stockholders of Alleghany, brought an action against the United States before a three judge court in this district pursuant to the Urgent Deficiencies Act, 28 U.S.C. §§ 2321–2325, for an injunction requiring the Commission to set aside its orders in that case to the extent that they granted the application of Alleghany to be considered as a carrier subject to regulation under the Interstate Commerce Act. The scope of the action was thereafter enlarged to include a prayer for an injunction against the enforcement of the orders of the ICC approving the Alleghany preferred stock issue.

The plaintiffs proceeded on the theory that the decisions of the ICC that Alleghany was to be considered as a carrier subject to regulation under §§ 20 and 20a of the Interstate Commerce Act for the purpose, among others, of the issuance of securities, were erroneous; that Alleghany was not exempt from the Investment Company Act but subject to regulation thereunder by the SEC; that the preferred stock issue required approval by the SEC rather than the ICC; and that the ICC orders assuming regulatory jurisdiction over Alleghany should therefore be set aside and declared void. There are four reported decisions by the three judge court in the Breswick case and two by the Supreme Court reversing the three judge court. Breswick & Co. v. United States, 134 F.Supp. 132 (S.D.N.Y. 1955), 138 F.Supp. 123 (S.D.N.Y. 1956) (per curiam), rev'd sub nom. Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726; 156 F.Supp. 227 (S.D.N.Y. 1957), rev'd per curiam sub nom. Alleghany Corp. v. Breswick & Co., 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374; 160 F.Supp. 754 (S.D.N.Y. 1958).

The Breswick litigation did not directly pass on the question presented in the case at bar—whether Alleghany remained subject to Interstate Commerce Act regulation during the period immediately subsequent to the sale of the C. & O. stock to Eaton on January 19, 1954, and covering the sale of the Central stock by C. & O. to Alleghany on February 23, 1954. This was because the issues in Breswick centered on a subsequent time period.

However, the litigation has an important bearing on the question presented in this case. Moreover, the views originally expressed by the three judge court in decisions which were reversed by the Supreme Court throw light on an early decision in the case at bar. While it is unnecessary to go into all the details of the protracted Breswick litigation, a discussion of the case is essential to an understanding of the nature and effect of the orders of the ICC on which the defendants rely here and the reasons why the present action cannot stand.

In Breswick plaintiffs first moved before the three judge court for a preliminary injunction vacating the ICC orders determining that Alleghany be considered as a carrier, and enjoining the enforcement of its orders approving the issuance of the preferred stock. The court granted the injunction on the grounds (a) that upon the relinquishment of control of C. & O. by Alleghany on January 19, 1954, Alleghany automatically ceased to be subject to ICC regulation, became an investment company subject to regulation by the SEC and the ICC's order of June 5, 1945 subjecting Alleghany to Interstate Commerce Act regulation "unless and until otherwise ordered" by the ICC became "empty fiat"; and (b) that even if the June 5, 1945 order continued in effect until terminated by the ICC, Alleghany could not substitute control of Central for control of C. & O. without approval by the ICC based on facts which had not been adduced before the Commission and findings which it had not made. 134 F.Supp. 132, 142.[3]

---

3. Judge Walsh, a member of the three judge court, followed this opinion in Breswick & Co. v. Briggs, 135 F.Supp.

397 (S.D.N.Y.1955). This decision was prior to any of the further proceedings in the three judge court action.

The three judge court then had a hearing on the merits and took extensive testimony. It granted a permanent injunction setting aside the ICC orders under attack on a variety of grounds similar to those on which it had granted preliminary relief, with an exception significant for purposes of the case at bar.

Instead of holding that the ICC order of June 5, 1945 had automatically terminated upon relinquishment of control of C. & O. by Alleghany, the court stated that "when Alleghany divested itself of the control of *all* carriers, the order of June 5, 1945 became inoperative," with a footnote to the effect that Alleghany on May 21, 1954 (three months after the transactions attacked in the case at bar had already taken place), had divested itself of control of the United States Trucking Company through its ownership of the Pittston stock and after that date had "ceased to control even that one carrier." 138 F.Supp. 123, 129 and n. 7a. (Emphasis added.)

On direct appeal under 28 U.S.C. § 1253 from the final judgment of the three judge court the Supreme Court reversed. Although the court did not discuss the question of whether the ICC order of June 5, 1945 remained in effect until terminated, it held that the ICC had jurisdiction to issue the orders giving Alleghany status to be considered as a carrier subject to regulation by the ICC by virtue of its control of New York Central. It remanded the case to the district court for consideration of the claim that the preferred stock issue as approved by the Commission was in violation of the Interstate Commerce Act. Significantly insofar as the case at bar is concerned Justice Douglas in dissent, with whom the Chief Justice and Justice Black joined, said:

"Alleghany had a carrier status, granted it by the Interstate Commerce Commission, when it acquired the stock of the Chesapeake & Ohio R. Co. and two other carriers. That order, issued in 1945, gave it a carrier status 'unless and until otherwise ordered' by the Commission. That order was terminated by the Commission on May 24, 1955.

"The approval of the preferred stock issue that is involved in this litigation did not come until later, *viz.* June 22, 1955. At that time it seems plain that Alleghany had no carrier status * * *." 353 U.S. 151, 179, 77 S.Ct. 763, 779, 1 L.Ed. 2d 726.

On remand the three judge court again granted judgment to the minority stockholder plaintiffs. It sustained the preferred stock issue against attacks on its basic fairness. However, it set aside the ICC order approving the issue upon the ground that, while the Commission had jurisdiction over Alleghany under the Supreme Court decision, it had not been asked for or given approval to the acquisition by Alleghany of control over the New York Central system. The three judge court went on to hold that validation of such control by the ICC was a prerequisite to authorization by the Commission of the Alleghany preferred stock issue, and absent such validation the Commission could not give such authorization. 156 F.Supp. 227.

On direct appeal the Supreme Court, per curiam, again reversed the three judge court, and remanded the case for consideration of what it said was the only claim left open by its prior decision— "whether 'the preferred stock issue as approved by the [Interstate Commerce] Commission was in violation of the Interstate Commerce Act.' " 355 U.S. 415, 416, 78 S.Ct. 421, 2 L.Ed.2d 374.

On the second remand from the Supreme Court the three judge court vacated the injunction previously issued and dismissed the complaint on the merits.[4] 160 F.Supp. 754.

4. For another attempt to overturn the ICC orders see Neisloss v. Bush, 110 U.S. App.D.C. 396, 293 F.2d 873 (D.C.Cir. 1961). This action, brought by stockholders of Alleghany, was dismissed for failure to exhaust administrative remedies on reasoning similar to Breswick & Co. v. Briggs, supra.

The final result of the Breswick litigation insofar as it bears on the case at bar, may be summed up as follows:

1. It was squarely held that the order of the ICC of May 24, 1955 affirming the order of Division IV which subjected Alleghany to Interstate Commerce Act regulation by reason of its control of New York Central was valid.

2. The continuing effectiveness of the ICC order of June 5, 1945, which subjected Alleghany to Interstate Commerce Act regulation by reason of its control of C. & O. "unless and until otherwise ordered" by the Commission, was not directly in issue, but that order was not reversed or modified.

3. The second opinion of the three judge court indicates the view that the June 5, 1945 order was in effect at least until May 21, 1954, when Alleghany disposed of its Pittston stock.

4. It was apparently the view of at least three Justices of the Supreme Court that the June 5, 1945 order was valid until the termination of that order as of March 2, 1955 was affirmed by the full Commission on May 24, 1955.

(c) Prior decisions in the case at bar.

On October 18, 1957, some three weeks after the second opinion of the three judge court in Breswick v. United States, Judge Dimock denied a motion for summary judgment in the case at bar by defendants Eaton, Tuohy and Eaton, Jr. Schwartz v. Bowman, 156 F.Supp. 361 (S.D.N.Y.1957). Judge Dimock had been a member of the three judge court in Breswick and had written the initial opinion of that court granting a preliminary injunction.

Judge Dimock held that the complaint stated a claim for relief under the Investment Company Act of 1940. However, he concluded that the court had acquired no personal jurisdiction over the moving defendants on the pendent non-federal "claims" by reason of extraterritorial service on them under the provisions of the Investment Company Act. He therefore entered a judgment dismissing such "claims" without prejudice.

In holding that a claim for relief was stated under the Investment Company Act, Judge Dimock relied primarily on his opinion in the early stages of Breswick & Co. v. United States, granting a preliminary injunction, insofar as it held that the ICC June 5, 1945 order subjecting Alleghany to ICC regulation became automatically void after Alleghany disposed of its C. & O. stock on January 19, 1954. He quoted his prior language in Breswick to the effect that after such stock was disposed of, the 1945 order "was empty fiat" as to all persons but Alleghany. 156 F.Supp. at 361. He also reasoned that it was the duty of Alleghany to obtain ICC authorization before divesting itself of its C. & O. stock, and that the moving defendants, as alleged co-conspirators, could not take advantage of such breach of duty by claiming that Alleghany had not reverted to the status of an investment company subject to regulation by the SEC.

Judge Dimock also quoted from the language of the second Breswick opinion to the effect that "when Alleghany divested itself of the control of all carriers, the order of June 5, 1945, became inoperative" but he did not advert to the footnote explanatory of that statement which pointed out that Alleghany did not divest itself of the last of its carrier control (Pittston) until May 24, 1954, months after the acquisition by Alleghany of its Central stock. 156 F.Supp. 363.

It may be noted that Judge Dimock handed down this decision before the second Supreme Court reversal of the three judge court in Breswick and prior to the final decision in Breswick dismissing the complaint on the merits.

Moreover, the issue on which Judge Dimock passed is not the issue before me in the case at bar. Judge Dimock did not have before him the complete record of the almost continuous proceedings before the ICC following the C. & O. divestiture on January 19, 1954, and continuing through to its order of May 24, 1955. The issues now presented as to the pri-

mary jurisdiction of the ICC over Alleghany's regulatory status and the lack of jurisdiction to annul or set aside orders of the ICC without complying with the requirements of the Urgent Deficiencies Act, were not raised before him and were not passed on. Judge Dimock was concerned with the sufficiency of the complaint not with the question of subject matter jurisdiction over the claim allegedly stated.

Not only are the issues now before me different from those passed upon by Judge Dimock, but the later decision of the Supreme Court and the final dismissal of the complaint on the merits in Breswick v. United States put a different face on the early Breswick opinions on which Judge Dimock relied. The questions presented here are fresh ones and Judge Dimock's opinion is in no way controlling.

The plaintiff in this case appealed to the Court of Appeals from what he claimed to be Judge Dimock's final judgment dismissing the non-statutory pendent diversity "claims" against the moving defendants for want of personal jurisdiction. There was, of course, no appeal from the denial of summary judgment on the federal aspects of the complaint, nor could there have been. The Court of Appeals dismissed the plaintiff's appeal from the judgment dismissing the pendent "claims" upon the ground that it was not final and therefore not appealable. Schwartz v. Eaton, 264 F.2d 195 (1959). Judge Clark held that the pendent claims which the district court had dismissed were not separate and distinct claims within the meaning of Rule 54(b), F.R. Civ.P., but merely legal theories arising out of a single claim, and that therefore no final judgment on them could have been rendered. There was no issue before the Court of Appeals as to the sufficiency of the complaint under the Investment Company Act though the court in a footnote indicated that private rights of action are available under the Investment Company Act. 264 F.2d 197–198 and n. 5. The decision of the Court of Appeals dismissing the plaintiff's appeal plainly does not affect the questions now before me.

■ From this necessarily lengthy recital it emerges quite clearly that

1. The ICC has determined by its orders of June 5, 1945, March 2, 1955 (Division IV) and May 24, 1955, that during the period of time relevant here Alleghany was subject to regulation by the Commission under the Interstate Commerce Act.

2. Such orders insofar as they affect the relevant time period have never been reversed, vacated, set aside or modified in any proceedings to review under the Urgent Deficiencies Act.

3. In the action before the three judge court under that act to review the March 2 and May 24, 1955 orders of the Commission holding Alleghany subject to Interstate Commerce Act regulation, the orders were sustained.

4. If these outstanding orders of the ICC are to be given effect, Alleghany was expressly exempt from the Investment Company Act pursuant to § 3(c) (9) at the time of the Central transaction and was not required to register with the SEC or subject to regulation by that body.

5. The question now before the court—whether there is jurisdiction to entertain the federal aspects of the action under the Investment Company Act in the light of the primary jurisdiction of the ICC and its outstanding orders—has not been passed on hitherto. Prior decisions are not controlling on that question.

■ Two questions remain—(1) Does the action at bar necessarily involve directly or indirectly an attack on the validity of outstanding orders and decisions of the ICC, and (2) if so, has this court jurisdiction of the action? I turn now to these questions.

(d) The action involves an attack on the ICC orders.

There can be no serious doubt that this action involves an attack on the validity of ICC orders and decisions.

Federal jurisdiction is based solely on the Investment Company Act of 1940. The complaint specifically alleges that after the sale of Alleghany's C. & O. stock,

on January 19, 1954, Alleghany became an investment company subject to the Investment Company Act and required to register as an investment company with the SEC.

This allegation is the essence of plaintiff's federal ground for relief. It is upon this premise that plaintiff claims that the Central stock transaction of February 23, 1954 must be rescinded and set aside as void. This in turn is premised upon his theory that at the time of the Central transaction Alleghany had ceased to be subject to ICC regulation, that it was therefore an investment company required to register with the SEC under the Investment Company Act, that it failed to do so, and that the transaction was void under § 47 of the Investment Company Act and must be rescinded.

On the other hand, defendants in their answers specifically rely on the ICC orders of June 5, 1945, March 2, 1955 and May 24, 1955, holding that Alleghany was subject to Interstate Commerce Act regulation. They allege that the June 5, 1945 order "remained in full force and effect until terminated by order of Division 4 of the Interstate Commerce Commission, on and as of March 2, 1955, said order being affirmed by the Interstate Commerce Commission on May 25, 1955 [*sic*]."

Their position is that under these orders Alleghany was subject to ICC regulation throughout the period relevant in this lawsuit and thus was specifically exempt from the Investment Company Act.

Thus the issue is squarely drawn as to whether or not the orders of the ICC on which defendants rely are valid and effective, as defendants contend, or must be set aside as void, as contended by plaintiff.

In order for the plaintiff to succeed under the Investment Company Act there must be a finding by the court that Alleghany was not subject to regulation under the Interstate Commerce Act at the time of the Central transaction and was therefore not exempt from the Investment Company Act. For, unless such a finding is made, the Investment Company Act is wholly inapplicable and no claim for violation of that act and for relief based thereon could possibly lie.

Of necessity such a finding would require a holding that the orders of the ICC determining that Alleghany was subject to Interstate Commerce Act regulation during the relevant time period and thus was exempt from the Investment Company Act were of no force and effect and should be vacated and set aside. Thus, the action necessarily involves an attack on the validity of ICC orders and decisions, at the least indirectly, since it cannot succeed unless such determinations are overridden.

(e) Subject matter jurisdiction.

Finally we come to the key question of the jurisdiction of this court to grant relief under the Investment Company Act in this action.

Defendants first urge that the question of Alleghany's regulatory status under the Interstate Commerce Act is within the primary jurisdiction of the ICC, is required to be determined initially by the Commission and may not be determined by the court in this action.

■■ The doctrine of primary jurisdiction which defendants invoke is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. The doctrine comes into play when the enforcement of a claim originally cognizable in the courts "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." United States v. Western Pac. R.R., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); General American Tank Car Corp. v. Eldorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940). For purposes of uniformity and consistency in the regulatory activities of the agency concerned, and in the light of the special competence of the agency in its field, the power to determine questions which are entrusted to the expert and specialized knowledge of the agency by Congress is

transferred in the first instance from the court to the agency. Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958); United States v. Western Pac. R.R., supra; Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); United States Navigation Co. v. Cunard S.S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932); Texas & Pac. R.R. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907).

Under § 5 of the Interstate Commerce Act detailed authority is vested in the ICC over "combinations and consolidations of carriers." Section 5(3) gives the Commission authority over any

> "person who is not a carrier [who] is authorized, by an order under paragraph (2) of this section to acquire control of any carrier or of two or more carriers * * *."

Section 5(3) further provides that such a person "thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to" specified regulatory sections of the act, including the penalties applicable for violation of such provisions. Section 5(11) provides that "[t]he authority conferred [on the Commission] by this section shall be exclusive and plenary * * *."

■ Thus it appears that Congress has entrusted to the Commission, charged as it is with the administration of the national transportation policy (49 U.S.C. Preamble), "exclusive and plenary" au-

thority to determine what persons are to be considered as carriers and the regulatory status of such persons.

Here, in the exercise of that authority the Commission has determined that Alleghany was to be considered as a carrier subject to regulation under the Interstate Commerce Act during the entire time period relevant in this litigation. Unless those determinations are set aside Alleghany was exempt from the Investment Company Act under the express terms of that statute.

■ The doctrine of primary jurisdiction does not come into play where, as here, a regulatory body has already asserted jurisdiction and made a determination of the matters entrusted to its special competence.[5] Here the Commission has asserted jurisdiction and made its determinations on the primary issue presented in the action. The question then concerns the second contention made by defendants —whether such outstanding ICC determinations that Alleghany was subject to Interstate Commerce regulation can be annulled or set aside by the court in this action. It is plain that this court has no jurisdiction to do so.

■ Congress has established an exclusive method for the review or enforcement of orders of the ICC in chapter 157 of the Judicial Code "Interstate Commerce Commission Orders; Enforcement and Review" (the Urgent Deficiencies Act). Procedure in "actions to enforce, suspend, enjoin, annul or set aside in whole or in part any order of the Interstate Commerce Commission other than for the payment of money or the collection

---

5. Nevertheless were the plaintiff able to establish a right to rescission here, it is likely that serious questions of primary jurisdiction would arise as to the relief to be afforded. To grant rescission as the plaintiff asks would mean that the Central stock was returned to C. & O. and this might well deliver control of one major railroad system to another major system. This could not be accomplished without the approval of the ICC under § 5(2) (a) (i) of the Interstate Commerce Act. In the light of the plenary and exclusive authority of the Commission over this

subject matter under § 5(11) of the act there is grave doubt whether this court would have power to afford the relief of rescission even if it had subject matter jurisdiction over the Investment Company Act aspect of the action.

In any event this prospect gives additional emphasis, to the need for compliance with the requirements of the Urgent Deficiencies Act to protect the public interest and the want of subject matter jurisdiction in this action which I am about to discuss.

of fines, penalties and forfeitures, shall be as provided" in chapter 157. 28 U.S.C. § 2321.

All such actions "shall be brought by or against the United States." 28 U.S.C. § 2322.

The United States is to be represented by the Attorney General. The ICC and any parties in interest to the proceeding before the Commission in which the order is made may appear as of right. "Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Commission * * * may intervene in said action at any time after the commencement thereof." The Attorney General may not dispose of or discontinue the action over the objection of any other party or intervenor, "who may prosecute, defend, or continue said action unaffected by the action or nonaction of the Attorney General * * *." 28 U.S.C. § 2323.

The pendency of an action to review does not in itself stay or suspend the Commission's order, but such a stay may be granted by the court. 28 U.S.C. § 2324.

Finally, an application for "[a]n interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission" must be heard and determined by a district court of three judges under 28 U.S.C. § 2284. 28 U.S.C. § 2325. There is direct appeal to the Supreme Court as in all three judge court cases. 28 U.S.C. § 1253.

It is recognized that in the enactment of chapter 157 Congress was concerned with providing special remedies for the enforcement and review of ICC orders to insure that the public interest as well as the interests of all parties concerned would be adequately protected. Therefore, compliance with the requirements of chapter 157 has been strictly enforced. See Ayrshire Collieries Corp. v. United States, 331 U.S. 132, 67 S.Ct. 1168, 91 L.Ed. 1391 (1947).

The act has been applied broadly to all cases in which orders of the ICC are under attack, whether directly or indirectly. In a long line of cases it has been consistently held that the Urgent Deficiencies Act is the exclusive method of reviewing the Commission's orders. An order of the Commission cannot be attacked unless the requirements of the act have been met. Venner v. Michigan Cent. R.R., 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926); Lambert Run Coal Co. v. Baltimore & O. R.R., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922); State of North Dakota ex rel. Lemke v. Chicago & N.W. Ry., 257 U.S. 485, 42 S.Ct. 170, 66 L.Ed. 329 (1922); Illinois Cent. R.R. v. Public Utilities Comm'n, 245 U.S. 493, 38 S.Ct. 170, 62 L.Ed. 425 (1918) (invalidity of ICC order raised in cross bill); Simpson v. South Western R.R., 231 F.2d 59 (5 Cir.), cert. den., 352 U.S. 828, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956); Atwater v. Wheeling & L.E. Ry., 56 F.2d 720 (6 Cir. 1932); Southern Pac. Co. v. City of Willow Glen, 49 F.2d 1005 (9 Cir.) cert. den., 284 U.S. 666, 52 S.Ct. 39, 76 L.Ed. 564 (1931); Village of Mantorville v. Chicago G.W. R.R., 8 F.Supp. 791 (D.Minn. 1934); Louisiana ex rel. Saint v. Morgan's Louisiana &. T R. & S. S. Co., 18 F.2d 645 (E.D.La. 1927); Meyers v. Famous Realty, Inc., 271 F.2d 811, 817 (2 Cir. 1959) (alternative holding); see Breswick & Co. v. United States, 134 F.Supp. 132, 139 and n. 2 (S.D.N.Y. 1955); Breswick & Co. v. Briggs, 130 F.Supp. 953 (S.D.N.Y. 1955); cf. Coffman v. Breeze Corps., 323 U.S. 316, 317–18 n. 1, 65 S.Ct. 298, 89 L.Ed. 264 (1945); United States v. Ry. Exp. Agency, Inc., 101 F.Supp. 1008 (D.Del. 1951) (collateral attack by the Government); ICC v. Consolidated Freightways, 41 F.Supp. 651 (D.N.D. 1941) (invalidity of ICC order raised as defense). But cf. Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580 (1948) (suit to *enforce* ICC order); United States v. Corrick, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936) (no reviewable ICC order); Central New England Ry. Co. v. Boston & A. R. R., 279 U.S. 415, 49

S.Ct. 358, 73 L.Ed. 770 (1929) (interpretation of order). Compare Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965) (Federal Reserve Board order).

■ The requirements of the act are not mere matters of procedure. They were imposed by Congress as a matter of "the policy of the United States" in order to protect the public interest in the complicated and specialized area entrusted to jurisdiction of the Commission. State of North Dakota ex rel. Lemke v. Chicago & N.W. Ry., 257 U.S. at 490, 42 S.Ct. at p. 171.

■ The requirements of the act apply equally whether the order under attack is mandatory or permissive. Venner v. Michigan Cent. R.R., supra; Simpson v. South Western R.R., supra; Atwater v. Wheeling & L.E. Ry., supra; Village of Mantorville v. Chicago G.W. R.R., supra; Louisiana ex rel. Saint v. Morgan's Louisana & T.R. & S.S. Co., supra; United States v. Railway Exp. Agency, Inc., supra.

■ Moreover, in order for an action or proceeding to fall within the purview of the act it is unnecessary that there be a request that an ICC order be set aside or that a specific order even be mentioned on the face of the pleadings. If it can be established extrinsically that the practical effect of success on the merits by the party making a claim would be to invalidate the order, the act applies and its requirements must be met. Venner v. Michigan Cent. R.R., supra; Lambert Run Coal Co. v. Baltimore & O.R.R., supra; Simpson v. South W.R.R., supra; Village of Mantorville v. Chicago G.W. R.R., supra.

In the case at bar it is plain, as has already been pointed out, that if plaintiff were to succeed under the Investment Company Act, the effect would necessarily be to set aside and invalidate "in whole or in part" orders of the Commission. Such orders include that of June 5, 1945 subjecting Alleghany to Interstate Commerce Act regulation "unless and until otherwise ordered" by the Commission; that of Division IV holding that the June 5, 1945 order continued in force and effect up to and did not terminate until March 2, 1955; and that of the full Commission of May 24, 1955 affirming the decision and order of Division IV. Since the action necessarily involves an attack on the validity of these ICC orders, it falls directly within the terms of the Urgent Deficiencies Act.

This action was commenced on January 18, 1957. This was after the three judge court in Breswick v. United States had rendered its first decision granting final judgment to plaintiff on the merits, but before that decision was reversed by the Supreme Court, and, of course, before the second reversal by the Supreme Court and granting of final judgment for the defendants. It is reasonable to suppose that the action was brought in reliance upon language in the early decisions in that case while they still stood unreversed.

None of the requirements of the Urgent Deficiencies Act have been met. Plaintiff chose to bring this private action to set aside orders of the ICC, involving as they do matters of public concern, without meeting the mandatory requirements imposed by Congress as to parties and procedure.

■ The action was not "brought * * * against the United States" as required by 28 U.S.C. § 2322. Not only is the United States an indispensable party to such an action, Seaboard Air Line R.R. Co. v. Daniel, supra; Lambert Run Coal Co. v. Baltimore & O.R.R., supra, but the absence of the United States as a party is a fatal jurisdictional defect. Venner v. Michigan Cent. R.R., supra; Lambert Run Coal Co. v. Baltimore & O.R.R., supra; Illinois Cent. R.R. v. Public Utilities Comm'n, supra; Atwater v. Wheeling & L.E. Ry., supra.

No opportunity was given for the ICC or whatever other parties in interest there may be to appear as of right or for such intervention of other parties as the act allows. 28 U.S.C. § 2323.

Yet during some eight years in which the action has been pending there have been two reported and five unreported decisions by the district court and extensive pre-trial discovery has been conducted without the presence of, notice to or participation by any of such parties. Plaintiff has ignored the Urgent Deficiencies Act entirely.[6]

Now for the first time the question of want of jurisdiction for failure to comply with the requirements of the Act is squarely posed. Questions of jurisdiction, of course, can be raised at any time. And, as the Supreme Court said in Lambert Run in a private action in which indirect attack was made on ICC orders. —"Jurisdiction cannot be effectively acquired by concealing for a time the facts which conclusively establish that it does not exist." 258 U.S. at 382, 42 S.Ct. at p. 351.

It is now apparent that jurisdiction under the Investment Company Act does not exist. The court in this action has no power to consider or determine the question which is basic to relief under that act—the validity of the ICC orders here under attack. This is so whether the ICC was correct or incorrect in making such orders.[7] The validity of the orders can be tested only in an appropriate action under the Urgent Deficiencies Act.

The want of subject matter jurisdiction under the Investment Company Act is fatal to that aspect of the complaint.

## II. The pendent non-federal aspects of the complaint.

In addition to the federally based allegations under the Investment Company Act there are also non-federal allegations in the complaint seeking relief for what is apparently claimed to be violation of common law fiduciary duties. Defendants Eaton, Tuohy, Murchison, Eaton, Jr. and Young's executrix were served outside of New York State, and personal jurisdiction over them was purportedly acquired solely under the provisions of § 44 of the Investment Company Act, which permits extraterritorial service. Thus, while subject matter jurisdiction on the non-federal aspects of the complaint is based on diversity, personal jurisdiction over these defendants on this phase of the claim is necessarily based on the theory that such jurisdiction was pendent.

But the doctrine of pendent jurisdiction is not applicable where, as here, subject matter jurisdiction over the federal aspects of the claim is lacking. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); A. H. Bull S.S. Co. v. National Marine Engineers' Ass'n, 250 F.2d 332 (2 Cir. 1957); Howard v. Furst, 238 F.2d 790 (2 Cir. 1956), cert. den., 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759 (1957).

I hold under this well settled principle that since subject matter jurisdiction is lacking over the federal aspects of the

6. Defendants also strongly urge that this action can only be brought before a three judge court under 28 U.S.C. § 2325, and that this court lacks subject matter jurisdiction for that reason also. Section 2325 requires that an application for an "injunction restraining the enforcement, operation or execution, in whole or in part, of any order of" the ICC must be heard and determined by a three judge court. Since the relief sought here involves the setting aside of ICC orders and rescission of a transaction which would otherwise not be subject to federal attack, it is urged that the action is in essence an application for a mandatory injunction falling within § 2325.

This is not free from doubt in view of the differences in language between §

2321 dealing with actions "to enforce, suspend, enjoin, annul or set aside in whole or in part" Commission orders and that of § 2325, in whole or in part, "restraining the enforcement, operation or execution" of such orders. No cases have been called to my attention directly dealing with this question, and I have found none. See generally Carbone Bros. & Co. v. United States, 194 F.Supp. 79 (S.D.N.Y.1961). It is unnecessary, however, to pass upon the question here in view of the failure to comply with the other mandatory requirements of the Urgent Deficiencies Act.

7. Nothing said here should be taken as indicating a view that the ICC was incorrect in so doing.

complaint, the non-federal aspects of the complaint against defendants Eaton, Tuohy, Murchison, Eaton, Jr. and Young's executrix, based on common law, which are pendent, must fall for want of personal jurisdiction. The complaint must therefore be dismissed in its entirety as to those defendants.

■ In contrast, defendants Kirby and Alleghany were served in New York. There is thus both diversity subject matter jurisdiction and personal jurisdiction as to those defendants. While, as I have held, this court has no subject matter jurisdiction over the federal aspects of the complaint, nevertheless as to Kirby and Alleghany the complaint, stripped of its federal aspects, states a non-federal common law diversity claim which is valid on its face. Thus, the complaint cannot be dismissed as to Kirby and Alleghany under the reasoning of the Court of Appeals in Schwartz v. Eaton, supra, since a claim of some sort is stated. Nor, apparently, on that reasoning can any particular allegations of the complaint be stricken on a motion to dismiss even though there is want of subject matter jurisdiction upon the theory on which such allegations proceed.

C & O., the nominal defendant in this derivative action, may be served "in any district where it is organized or licensed to do business or is doing business." 28 U.S.C. § 1695. It has appeared generally in the action. The complaint cannot be dismissed as to it either.

Plaintiff on the argument of the motions before me indicated that he was not interested in salvaging his action thus stripped down and subject to appropriate motions for security for costs and expenses. But that is not a matter for determination here.

The motions of defendants Eaton, Tuohy, Murchison, Eaton, Jr. and Young's executrix to dismiss the complaint as against them for want of jurisdiction over the subject matter is granted. The motions of defendants Kirby and Alleghany and of the nominal defendant C. & O. to dismiss the complaint are denied.

This disposition makes it unnecessary to pass on the other phases of the motions made by the various defendants.

Settle order on notice directing the entry of judgment accordingly.